[S. F. No. 24591. July 18, 1985.]

PAUL PERDUE, Plaintiff and Appellant, v.
CROCKER NATIONAL BANK, Defendant and Respondent.

**COUNSEL**

Gary J. Near, Stephen Kaus, Kaus & Kerr, Allan B. Morrison, William B. Schultz, Steven M. Kipperman, Friedman, Shawn, Kipperman & Sloan, Mark M. Garay, Garay & Foreman and Robert N. Weaver for Plaintiff and Appellant.

Manuel Glenn Abascal, Howard M. Klepper, E. Robert Wallach, David B. Baum, Sidney M. Wolinsky, Victoria J. De Goff, Richard Sherman, Harry M. Snyder, Ephraim Margolin, Sandra Coliver, Ted Cassman and Emma Coleman Jordan as Amici Curiae on behalf of Plaintiff and Appellant.

William Alsup, Ellen Borgersen, Paul Flum, Andrew Monach, Charles R. Farrar, Jr., Kathleen V. Fisher, Richard L. Keenan and Morrison & Foerster for Defendant and Respondent.

Brian W. Smith, Ronald R. Glancz, Frank C. Bonaventure, Jr., L. Robert Griffin, Eugene M. Katz, Weyman I. Lundquist, Robert E. Borton, David P. Kincaid, Heller, Ehrman, White & McAuliffe, Almon B. McCallum and Loring E. Tocchini as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**BROUSSARD, J.**—Plaintiff filed this class action to challenge the validity of charges imposed by defendant Crocker National Bank for the processing of checks drawn on accounts without sufficient funds. (The parties refer to such checks as NSF checks and to the handling charge as an NSF charge.) He appeals from a judgment of the trial court entered after that court sustained defendant's general demurrer without leave to amend.

On July 3, 1978, plaintiff filed suit on behalf of all persons with checking accounts at defendant bank and a subclass of customers who have paid NSF charges to the bank.[1] The complaint first alleges a contract under which the bank furnishes checking service in return for a maintenance charge.[2] It then asserts that "It is the practice of defendants to impose and collect a unilaterally set charge for processing checks presented against plaintiffs' accounts when such accounts do not contain sufficient funds to cover the amount of the check." "Defendants have at various times unilaterally increased the NSF charge to an amount the defendants deemed appropriate, without reference to any criteria, and defendants imposed and collected the said in-

---

[1] The complaint refers to both "plaintiffs" and "defendants" in the plural. Perdue, however, is the only named plaintiff; the others are unidentified members of the class. The complaint names Crocker National Bank and Does 1-100 as defendants, but the "Doe" defendants have not been served or identified. We refer to both parties in the singular.

[2] Paragraph 7 states: "Defendants offer said checking services in exchange for a promise by plaintiffs to pay a predetermined charge set by defendants [hereafter called the maintenance charge.] Plaintiffs, at the commencement of the checking account agreed to pay said maintenance charge, or to maintain a minimum balance in their checking account or some similar arrangement, unless such charge was waived. . . ."

creased amount without any explanation or justification by defendants to plaintiffs." At the time of filing of the suit, the charge was $6 for each NSF check, whether the check was honored or returned unpaid, even though "the actual cost incurred by the defendants in processing an NSF check is approximately $0.30."

The bank requires each depositor to sign a signature card which it uses "to determine and verify the authenticity of endorsements on checks." In extremely small (6 point) type, the signature card states that the undersigned depositors "agree with Crocker National Bank and with each other that . . . this account and all deposits therein shall be . . . subject to all applicable laws, to the Bank's present and future rules, regulations, practices and charges, and to its right of setoff for the obligations of any of us." The card does not identify the amount of the charge for NSF checks, and the bank does not furnish the depositor with a copy of the applicable bank rules and regulations.[3]

On the basis of these allegations, plaintiff asserts five causes of action: (1) for a judicial declaration that the bank's signature card is not a contract authorizing NSF charges; (2) for a judicial declaration that such charges are oppressive and unconscionable; (3) to recover damages for unjust enrichment derived from the bank's collection of illegal NSF charges; (4) to enjoin alleged unfair and deceptive practices—the bank's failure to inform customers of the contractual nature of the signature card, and its practice of waiving NSF charges as to certain preferred customers; and (5) to recover the difference between the NSF charges and defendant's actual expenses in processing NSF checks on the theory that the charges represent an unreasonable attempt to fix liquidated damages.

Defendant filed general and special demurrers to each of the asserted causes of action. The superior court sustained the general demurrers and, taking notice of the fact that plaintiff had filed three previous complaints in another action raising similar issues,[4] denied leave to amend. Plaintiff appeals from judgment for defendant.

---

[3]Financial Code section 865.2, effective July 1, 1977, requires banks to make information about bank charges available to the public in an area of the bank open to the public. The complaint does not state whether defendant complied with this section.

[4]Plaintiff Perdue and coplaintiff Ralph Abascal filed a complaint against Crocker National Bank on March 15, 1977, raising issues similar to those of the present complaint. (S.F. Super. Ct. No. 720-309.) After the court sustained demurrers with leave to amend, Perdue and Abascal filed a first, and then a second amended complaint. On June 15, 1978, counsel for Perdue and counsel for Abascal severed their association, and counsel for Perdue filed the present action. The superior court subsequently denied a petition to coordinate the various actions attacking NSF check charges, and dismissed Perdue as a coplaintiff in action No. 720-309.

Plaintiff's third alleged cause of action is derivative; its charge of unjust enrichment depends upon a finding pursuant to some other cause of action that the NSF charges were invalid or excessive. This cause of action raises no issues for decision in the present appeal. The other four alleged causes of action, however, present independent and substantial issues. ▉ We review each in turn, applying the established principle that a demurrer "admits the truth of all material factual allegations in the complaint . . .; the question of plaintiff's ability to prove those allegations, or the possible difficulty in making such proof does not concern the reviewing court." (*Alcorn* v. *Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 496 [86 Cal.Rptr. 88, 468 P.2d 216]; *Committee on Children's TV, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 213-214 [197 Cal.Rptr. 783, 673 P.2d 660].)

I. *Plaintiff's first cause of action: whether the signature card is a contract authorizing NSF charges.*

The complaint alleges that "The signature card prepared by the defendants does not identify the amount of any charge to be paid by the plaintiffs for processing NSF checks and is not an agreement for such payment. The card does not constitute mutual assent to NSF charges in any particular sum or at all and accordingly is not a contract conferring authority to do the acts complained of herein." "Based upon the language of the signature card, the plaintiffs believed and expected that the signature card was intended as a handwriting example for purposes of identification and verification only." Plaintiff therefore seeks a judicial declaration "as to whether the signature card is a valid or enforceable contract and . . . a lawful basis for the imposition of the NSF charge."

The cases unanimously agree that a signature card such as the Crocker Bank card at issue here is a contract. "The bank is authorized to honor withdrawals from an account on the signatures authorized by the signature card, which serves as a contract between the depositor and the bank for the handling of the account." (*Blackmon* v. *Hale* (1970) 1 Cal.3d 548, 556 [83 Cal.Rptr. 194, 463 P.2d 418]; *Bullis* v. *Security Pac. Nat. Bank* (1978) 21 Cal.3d 801, 811-812 [148 Cal.Rptr. 22, 582 P.2d 109, 7 A.L.R.4th 642].) Other California decisions (see *Hoffman* v. *Security Pacific Nat. Bank* (1981) 121 Cal.App.3d 964, 969 [176 Cal.Rptr. 14]; *Larrus* v. *First National Bank* (1954) 122 Cal.App.2d 884, 889-890 [266 P.2d 143]) and decisions of other states (see, e.g., *In re Estate of Cilvik* (1970) 439 Pa. 522 [267 A.2d 836, 838, fn. 2]) also view the signature card as a contract.

Plaintiff does not seriously dispute this proposition. His complaint alleges that the depositors "agreed to pay [the bank's] maintenance charge . . ." in return for checking privileges, and one could infer that they agreed to do

so by affixing their signatures to the card. █ Complaints filed by plaintiff in an earlier action stated expressly that the signature card was a contract.[5]

█ Plaintiff argues, however, that even if a signature card is a contract to establish a checking account, it is not a contract authorizing NSF charges. He contends that the contract is illusory because it permits the bank to set and change the NSF charges at its discretion, and without assent from the customer except such as may be inferred from the fact that the customer does not cancel his account after the bank posts notice of its rates.[6]

Plaintiff relies on the rule that "[a]n agreement that provides that the price to be paid, or other performance to be rendered, shall be left to the will and discretion of one of the parties is not enforceable." (*Automatic Vending Co.* v. *Wisdom* (1960) 182 Cal.App.2d 354, 357 [6 Cal.Rptr. 31].) █ That rule, however, applies only if the total discretion granted one party renders the contract lacking in consideration. (See *ibid.*) If there are reciprocal promises, as in the present case, the fact that the contract permits one party to set or change the price charged for goods or services does not render the contract illusory. Thus in *Cal. Lettuce Growers* v. *Union Sugar Co.* (1955) 45 Cal.2d 474 [289 P.2d 785, 49 A.L.R.2d 496], the court upheld a contract permitting the buyer of sugar beets to set the price to be paid. █ The buyer did not have arbitrary power, the court explained, because "where a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing." (P. 484; see *Automatic Vending Co.* v. *Wisdom, supra,* 182 Cal.App.2d 354, 358 and cases there cited; cf. Civ. Code, § 1611; Cal. U. Com. Code, § 2305; 1 Corbin, Contracts (1963 ed.) § 98.) Likewise, "a contracting party's discretionary power to vary the price or other performance does not render the agreement illusory if the party's *actual* exercise of that power is reasonable." (*Powell* v. *Central Cal. Fed. Sav. & Loan Assn.* (1976) 59 Cal.App.3d 540, 549 [130 Cal.Rptr. 635], italics original; see *Vanguard Investments* v. *Central Cal. Fed. Sav. & Loan Assn.* (1977) 68 Cal.App.3d 950, 958 [137 Cal.Rptr. 719]; *Frankini* v. *Bank of America* (1939) 31 Cal.App.2d 666, 676 [88 P.2d 790].)

---

[5]The parties dispute whether the language in the complaints filed in action S.F. Super. Ct. No. 720-309 is binding upon plaintiff in the present case. It is well settled that a court may consider language of prior complaints in the same action in ruling on a demurrer (*Reichert* v. *General Ins. Co.* (1968) 68 Cal.2d 822, 836 [69 Cal.Rptr. 321, 442 P.2d 377]), but the cases do not discuss the effect of a prior complaint in a different action.

[6]Financial Code section 865.4, subdivision (b)(1) requires a bank to give customers 15 days' notice of any change in charges imposed on bank accounts.

■ The recent decision in *Lazar* v. *Hertz Corp.* (1983) 143 Cal.App.3d 128 [191 Cal.Rptr. 849], offers an analogy to the present litigation. Hertz' car rental agreement permitted it to determine unilaterally the price charged for gas used to fill the tanks of returned rental cars. Plaintiff's suit alleged that Hertz fixed unreasonably high prices, in breach of its duty of good faith and fair dealing. Discussing this cause of action, the court said that "[t]he essence of the good faith covenant is objectively reasonable conduct. Under California law, an open term in a contract must be filled in by the party having discretion within the standard of good faith and fair dealing." (P. 141.)

We conclude that plaintiff here is not entitled to a judicial declaration that the bank's signature card is not a contract authorizing NSF charges. To the contrary, we hold as a matter of law that the card is a contract authorizing the bank to impose such charges, subject to the bank's duty of good faith and fair dealing in setting or varying such charges. Plaintiff may, upon remand of this case, amend his complaint to seek a judicial declaration determining whether the charges actually set by the bank are consonant with that duty.

II. *Plaintiff's second cause of action: whether the bank's NSF charges are oppressive, unreasonable, or unconscionable.*

■ Plaintiff's second cause of action alleges that the signature card is drafted by defendant bank which enjoys a superior bargaining position by reason of its greater economic power, knowledge, experience and resources. Depositors have no alternative but to acquiesce in the relationship as offered by defendant or to accept a similar arrangement with another bank.[7] The complaint alleges that the card is vague and uncertain, that it is unclear whether it is intended as an identification card or a contract, that it imposes no obligation upon the bank, and permits the bank to alter or terminate the relationship at any time.[8] It then asserts that "The disparity between the actual cost to defendants and the amount charged by defendants for processing an NSF check unreasonably and oppressively imposes excessive and unfair liability upon plaintiffs." Plaintiff seeks a declaratory judgment to determine the rights and duties of the parties.

Plaintiff's allegations point to the conclusion that the signature card, if it is a contract, is one of adhesion. ■ The term contract of adhesion "sig-

---

[7]Defendant and other banks now offer some depositors an arrangement under which, for a fee, the bank will treat NSF checks up to a certain amount as credit card transactions, and honor such checks. We do not know whether such arrangements were available when plaintiff filed his complaint.

[8]The depositor also has the right to terminate the relationship at any time, but lacks the right asserted by the bank to alter the relationship without terminating it.

nifies a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." (*Neal* v. *State Farm Ins. Co.* (1961) 188 Cal.App.2d 690, 694 [10 Cal.Rptr. 781]; *Graham* v. *Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 817 [171 Cal.Rptr. 604, 623 P.2d 165].) The signature card, drafted by the bank and offered to the customer without negotiation, is a classic example of a contract of adhesion; the bank concedes as much.

In *Graham* v. *Scissor-Tail, Inc., supra,* 28 Cal.3d 807, we observed that "To describe a contract as adhesive in character is not to indicate its legal effect. . . . ■ [A] contract of adhesion is fully enforceable according to its terms [citations] unless certain other factors are present which, under established legal rules—legislative or judicial—operate to render it otherwise." (Pp. 819-820, fn. omitted.) "Generally speaking," we explained, "there are two judicially imposed limitations on the enforcement of adhesion contracts or provisions thereof. The first is that such a contract or provision which does not fall within the reasonable expectations of the weaker or 'adhering' party will not be enforced against him. [Citations.] The second—a principle of equity applicable to all contracts generally—is that a contract or provision, even if consistent with the reasonable expectations of the parties, will be denied enforcement if, considered in its context, it is unduly oppressive or 'unconscionable.' " (P. 820, fns. omitted.)[9]

In 1979, the Legislature enacted Civil Code section 1670.5, which codified the established doctrine that a court can refuse to enforce an unconscionable provision in a contract.[10] Section 1670.5 reads as follows: "(a) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract

---

[9]The Court of Appeal decision in *A & M Produce Co.* v. *FMC Corp.* (1982) 135 Cal.App.3d 473 [186 Cal.Rptr. 114, 38 A.L.R.4th 1], offers an alternative analytical framework. It treats "unconscionability" as the only basis for refusing to enforce a provision. (*Graham* v. *Scissor-Tail, Inc., supra,* 28 Cal.3d 807, spoke of "frustration of reasonable expectations" and "unconscionability" as alternative bases for refusing enforcement.)

*A & M Produce* then divided the analysis of unconscionability into two elements—procedural and substantive. The procedural element included "oppression" arising from unequal bargaining power and "surprise" arising from the assertion of hidden and unexpected provisions. The substantive element involved consideration of whether the provision was one-sided, unreasonable, and lacked justification. (See 135 Cal.App.3d at pp. 485-487.)

*Graham* v. *Scissor-Tail, Inc.* comports somewhat more closely to the California precedent; *A & M Produce* conforms more closely to the Uniform Commercial Code and the cases decided under that code. Both pathways should lead to the same result.

[10]Section 1670.5 is based upon Uniform Commercial Code section 2-302, but expands coverage to include noncommercial contracts. For review of the legislative history of section 1670.5, see *IMO Development Corp.* v. *Dow Corning Corp.* (1982) 135 Cal.App.3d 451, 459-460 [185 Cal.Rptr. 341].

without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result. [¶] (b) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose, and effect to aid the court in making the determination."

In construing this section, we cannot go so far as plaintiff, who contends that even a conclusory allegation of unconscionability requires an evidentiary hearing. We do view the section, however, as legislative recognition that a claim of unconscionability often cannot be determined merely by examining the face of the contract, but will require inquiry into its setting, purpose, and effect. ■■■■ ■ Plaintiff bases his claim of unconscionability on the alleged 2,000 percent differential between the NSF charge of $6 and the alleged cost to the bank of $0.30.[11] The parties have cited numerous cases on whether the price of an item can be so excessive as to be unconscionable. The cited cases are from other jurisdictions, often from trial courts or intermediate appellate courts, and none is truly authoritative on the issue. Taken together, however, they provide a useful guide to analysis of the claim that a price is so excessive as to be unconscionable.

■ To begin with, it is clear that the price term, like any other term in a contract, may be unconscionable. (*Patterson* v. *Walker-Thomas Furniture Co.* (D.C.Ct.App. 1971) 277 A.2d 111, 113 and cases there cited (fn. 6); see *Central Budget Corp.* v. *Sanchez* (1967) 53 Misc.2d 620 [279 N.Y.S.2d 391, 392]; *Merrel* v. *Research & Data, Inc.,* (1979) 3 Kan.App.2d 48 [589 P.2d 120, 123] (dictum); *Vom Lehn* v. *Astor Art Galleries, Ltd.* (1976) 86 Misc.2d 1 [380 N.Y.S.2d 532, 541].) Allegations that the price exceeds cost or fair value, standing alone, do not state a cause of action. (*Morris* v. *Capitol Furniture Co.* (App.D.C. 1971) 280 A.2d 775 [100 percent markup over cost]; *Patterson* v. *Walker-Thomas Furniture Co., supra,* 277 A.2d 111, 114 [price alleged to be in excess of fair value]; *Bennett* v. *Behring Corp.* (S.D.Fla. 1979) 466 F.Supp. 689, 696-698 [price in excess of value].) Instead, plaintiff's case will turn upon further allegations and proof setting forth the circumstances of the transaction.

The courts look to the basis and justification for the price (cf. *A & M Produce Co.* v. *FMC Corp., supra,* 135 Cal.App.3d 473, 487), including

---

[11]The bank's briefs claim the alleged $0.30 cost is too low and plaintiff's briefs admit that a higher figure, but still $1 or less, might be more accurate. We do not, however, find in plaintiff's briefs a sufficiently clear concession to enable us to depart from the general principle that, in reviewing a judgment after the sustaining of a general demurrer without leave to amend, we must assume the truth of all material factual allegations in the complaint. (*Alcorn* v. *Anbro Engineering, Inc., supra,* 2 Cal.3d 493, 496.)

"the price actually being paid by . . . other similarly situated consumers in a similar transaction." (*Bennett* v. *Behring Corp.*, *supra*, 466 F.Supp. 689, 697, italics omitted.) The cases, however, do not support defendant's contention that a price equal to the market price cannot be held unconscionable. While it is unlikely that a court would find a price set by a freely competitive market to be unconscionable (see *Bradford* v. *Plains Cotton Cooperative Assn.* (10th Cir. 1976) 539 F.2d 1249, 1255 [cotton futures]), the market price set by an oligopoly should not be immune from scrutiny. Thus courts consider not only the market price, but also the cost of the goods or services to the seller (*Frostifresh Corporation* v. *Reynoso* (1966) 52 Misc.2d 26 [274 N.Y.S.2d 757]; *Toker* v. *Westerman* (1970) 113 N.J.Super. 452 [274 A.2d 78]), the inconvenience imposed on the seller (see *Merrel* v. *Research & Data, Inc.*, *supra*, 589 P.2d 120, 123), and the true value of the product or service (*American Home Improvements, Inc.* v. *MacIver* (1964) 105 N.H. 435 [201 A.2d 886, 889]).

In addition to the price justification, decisions examine what Justice Weiner in *A & M Produce* called the "procedural aspects" of unconscionability. (See *A & M Produce Co.*, *supra*, 135 Cal.App.3d at p. 489.) Cases may turn on the absence of meaningful choice (*Patterson* v. *Walker-Thomas Furniture Co.*, *supra*, 277 A.2d 111, 113 and cases there cited), the lack of sophistication of the buyer (compare *Geldermann & Co., Inc.* v. *Lane Processing, Inc.* (8th Cir. 1975) 527 F.2d 571, 576 [relief denied to sophisticated investor]) with *Frostifresh Corporation* v. *Reynoso, supra*, 274 N.Y.S.2d 757 [relief granted to unsophisticated buyers]) and the presence of deceptive practices by the seller (*ibid.*; *Vom Lehn* v. *Astor Art Galleries, Ltd.*, *supra*, 380 N.Y.S.2d 532).

Applying this analysis to our review of the complaint at hand, we cannot endorse defendant's argument that the $6 charge is so obviously reasonable that no inquiry into its basis or justification is necessary.[12] In

---

[12]In *Jacobs* v. *Citibank, N.A.* (1984) 61 N.Y.2d 869 [474 N.Y.S.2d 464, 462 P.2d 1182], the New York Court of Appeals upheld a summary judgment for defendant bank in a suit attacking NSF check charges. In rejecting the claim that such charges were unconscionable, the court said that "[p]laintiffs have failed to show that they were deprived of a meaningful choice of banks with which they could do business and that the terms of these agreements with defendant were unreasonably favorable to the bank." (P. 872.)

While the New York court ruled on a motion for summary judgment, we rule upon a demurrer, and look only to plaintiff's allegations, not to the proof he had advanced to support those allegations. Plaintiff here has alleged that the charges imposed by defendant bank were excessive, and that similar arrangements would be imposed by other banks. Such allegations, which we must assume to be true, distinguish the New York decision.

1978 $6 for processing NSF checks may not seem exorbitant,[13] but price alone is not a reliable guide. Small charges applied to a large volume of transactions may yield a sizable sum. The complaint asserts that the cost of processing NSF checks is only $0.30 per check, which means that a $6 charge would produce a 2,000 percent profit; even at the higher cost estimate of $1 a check mentioned in plaintiff's petition for hearing, the profit is 600 percent.[14] Such profit percentages may not be automatically unconscionable, but they indicate the need for further inquiry.[15]

Other aspects of the transaction confirm plaintiff's right to a factual hearing. Defendant presents the depositor with a document which serves at least in part as a handwriting exemplar, and whose contractual character is not obvious. The contractual language appears in print so small that many could not read it. State law may impose obligations on the bank (e.g., the duty to honor a check when the account has sufficient funds (*Allen* v. *Bank of America, supra,* 58 Cal.App.2d 124, 127)), but so far as the signature card drafted by the bank is concerned, the bank has all the rights and the depositor all the duties. The signature card provides that the depositor will be bound by the bank's rules, regulations, practices and charges, but the bank does not furnish the depositor with a copy of the relevant documents. The bank reserves the power to change its practices and fees at any time, subject only to the notice requirements of state law.

In short, the bank structured a totally one-sided transaction. The absence of equality of bargaining power, open negotiation, full disclosure, and a contract which fairly sets out the rights and duties of each party demonstrates that the transaction lacks those checks and balances which would inhibit the charging of unconscionable fees. In such a setting, plaintiff's charge that the bank's NSF fee is exorbitant, yielding a profit far in excess of cost, cannot be dismissed on demurrer. Under Civil Code section 1670.5, the parties should be afforded a reasonable opportunity to present evidence

---

[13]Defendant cites *Merrel* v. *Research & Data, Inc., supra,* 589 P.2d 120, which held a $5 fee imposed by merchants for NSF checks was a "modest" amount (p. 123) and not unconscionable. NSF checks pose a substantial inconvenience to a seller, who has been deceived into an involuntary extension of credit to a customer whose credit standing may not be very good. A bank, however, is not deceived. It checks the balance of the account, and may reject any overdraft. A fee reasonable to compensate the merchant for the cost, inconvenience, and risk of an NSF check may be excessive if exacted by a bank.

[14]The complaint does not state the market price for the service of processing NSF checks, although one might infer it is similar to defendant's price since plaintiff alleges that if he did not contract with defendant, he would be "forced to accept a similar arrangement with other banks." The complaint does not set a figure for the "fair" or "true" value or worth of the service.

[15]We observe that the bank charges the same fee whether it honors or rejects an NSF check. The fee, consequently, cannot be intended as compensation for the credit risk arising from paying such a check, or for the interest on the amount loaned.

as to the commercial setting, purpose, and effect of the signature card and the NSF charge in order to determine whether that charge is unconscionable.

III. *Plaintiff's fourth cause of action: whether the bank has performed acts of unfair competition.*

Business and Professions Code section 17200 defines "unfair competition" to include any "unlawful, unfair, or fraudulent business practice." This language is intended to protect consumers as well as business competitors; its prohibitory reach is not limited to deceptive or fraudulent conduct but extends to any unlawful business conduct. (*Committee on Children's TV, Inc.* v. *General Foods Corp., supra,* 35 Cal.3d 197, 209-210; *Stoiber* v. *Honeychuck* (1980) 101 Cal.App.3d 903, 927 [162 Cal.Rptr. 194].)

The complaint charges two acts of unfair competition. First, it asserts that the "signature card is used in a manner which is unfair, deceptive and misleading, in that plaintiffs are led to believe that it is a signature card for identification purposes and the defendants treat the signature card, without disclosure of said fact, as the legal authority to impose the NSF charge on plaintiffs' checking accounts." Second, it asserts that "defendants arbitrarily and capriciously waive the NSF charge for preferred or commercial accounts," thus shifting the costs of processing NSF checks from those preferred customers to others whose accounts are charged.

Neither allegation is clear and precise. After reading paragraph 38, we are uncertain whether plaintiff contends that the signature card itself is deceptive, or whether he contends that the bank employs misrepresentations or other deceptive practices in presenting the card to the depositor. If the latter is plaintiff's contention, the complaint should set out the challenged representations or practices.

It is, of course, clear that if plaintiff can show that the card or the manner in which it is presented to the customer is deceptive and misleading, he can prove a cause of action for unfair competition. Since he seeks only injunctive relief under this cause of action, he need not show that he himself was misled; he need only prove that "members of the public are likely to be deceived." (*Chern* v. *Bank of America* (1976) 15 Cal.3d 866, 876 [127 Cal.Rptr. 110, 544 P.2d 1310]; *Committee on Children's TV, Inc.* v. *General Foods Corp., supra,* 35 Cal.3d 197, 211.) Thus the defect in plaintiff's allegation is not one of substance, but only of lack of certainty. Such a defect would not justify the sustaining of a demurrer without leave to amend. (*Minsky* v. *City of Los Angeles* (1974) 11 Cal.3d 113, 118 [113

Cal.Rptr. 102, 520 P.2d 726]; *La Sala* v. *American Sav. & Loan Assn.* (1971) 5 Cal.3d 864, 876 [97 Cal.Rptr. 849, 489 P.2d 1113].)

Plaintiff's assertion in paragraph 39 that the bank arbitrarily waives NSF charges for some customers contains a more serious defect. ▮ Although price discrimination is often unlawful, depending upon the context of the act and the intent of the perpetrator (see the Unfair Practices Act, Bus. & Prof. Code, § 17000 et seq.), "arbitrary" price discrimination in itself is not necessarily illegal. ▮ This defect is one of substance; while plaintiff's accusation in paragraph 38 of deceptive and misleading practices describes acts of unfair competition, albeit in very general terms, his accusation of arbitrary waiver of NSF charges does not.

Plaintiff could amend his complaint to add particulars which would show that the bank's discriminatory waiver of NSF charges violated some legal requirement. We are disturbed, however, that plaintiff has never advanced any theory under which the waiver would constitute unfair competition. Plaintiff has argued only that the waiver of NSF charges as to some customers shifts the processing costs to others. Even if true, that allegation would not suffice to prove unfair competition.

In conclusion, the superior court properly sustained a demurrer to plaintiff's fourth cause of action, but erred in denying leave to amend. Plaintiff should be permitted to amend to set out the alleged deceptive practices employed by defendant. The trial court would be within its discretion in denying leave to amend to claim unlawful discrimination in waiving NSF charges, but since plaintiff must be allowed to amend on the deceptive practices issue, the court may choose to permit amendment as to the waiver issue as well.

IV. *Plaintiff's fifth cause of action: whether the bank's charge for NSF checks is an unlawful penalty.*

▮ Paragraph 42 of the complaint states that "[c]ausing NSF checks to be presented for payment is a breach by plaintiffs of their contractual obligations to defendant . . . ." The NSF charge collected by defendants, however, "is a penalty and is not imposed to compensate defendants for damages incurred by plaintiffs' breach," and therefore violates Civil Code sections 1670 and 1671. The complaint concludes that "[p]laintiffs are entitled to recover the difference between the unlawful charges collected and defendants' actual damages . . . ."

▮ By these allegations, plaintiff seeks to invoke the rule that a contractual provision specifying damages for breach is valid only if it "repre-

sent[s] the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained." (*Better Food Mkts.* v. *Amer. Dist. Teleg. Co.* (1953) 40 Cal.2d 179, 187 [253 P.2d 10, 42 A.L.R.2d 580]; *Garrett* v. *Coast & Southern Fed. Sav. & Loan Assn., supra,* 9 Cal.3d 731, 739.) An amount disproportionate to the anticipated damages is termed a "penalty." A contractual provision imposing a "penalty" is ineffective, and the wronged party can collect only the actual damages sustained.[16]

 Two Court of Appeal decisions have addressed plaintiff's contention and concluded that the writing of an NSF check is not a breach of contract, and thus the fee charged for processing the check is not a penalty.[17] In *Hoffman* v. *Security Pacific Nat. Bank* (1981) 121 Cal.App.3d 964, 968-969 [176 Cal.Rptr. 14], the court said that "[p]laintiff argued, and attempted to prove, that the depositors entered into a covenant not to write NSF checks when they executed signature cards . . . . Plaintiff attempted to show that industry custom prohibited the writing of overdrafts without prior agreement and that the depositors' promise to pay a service charge for any NSF check contained an implied covenant not to write such checks. [¶] Plaintiff failed to establish any such custom or any agreement on the depositors' part not to write overdrafts. Moreover, statutes governing the obligations of banks and their depositors, which are incorporated into and become part of the contract between a bank and its depositors [citations], treat an overdraft as an application for advance credit rather than as a breach of an express or implied covenant. California Uniform Commercial Code section 4401 specifically authorizes a bank to pay overdrafts and to charge customers' accounts to recover amounts paid, even when payments result in overdrafts on the account. While a bank has a statutory obligation to honor any check drawn by a depositor for an amount not exceeding the

---

[16]In *Garrett* v. *Coast Southern Fed. Sav. & Loan Assn.* (1973) 9 Cal.3d 731 [108 Cal.Rptr. 845, 511 P.2d 1197, 63 A.L.R.3d 39], the leading case, we considered a provision which imposed a charge for late payment of installments due under a trust deed, but computed that charge as a percentage of the unpaid principal balance. Defendant savings and loan association contended that the provision did not impose a penalty for breach of obligation, but offered borrowers an alternative method for performing their obligation.

We concluded, however, that "the only reasonable interpretation of the clause providing for imposition of an increased interest rate is that the parties agreed upon the rate which should govern the contract and then, realizing that the borrowers might fail to make timely payment, they further agreed that such borrowers were to pay an additional sum as damages for their breach which sum was determined by applying the increased rate to the entire unpaid principal balance. Inasmuch as this increased interest charge is assessed only upon default, it is invalid unless it meets the requirements of section 1671. [Citations.]" (P. 738.) We held that the liquidated damages provision was invalid because it calculated damages on the basis of the entire unpaid balance, not on the basis of the amount of the overdue installment or the cost to the defendant. (P. 740.)

[17]A New York decision, *Jacobs* v. *Citibank, N.A., supra,* 61 N.Y.2d 869, reached the same conclusion.

balance in his account, and while the depositor has a contractual obligation to pay a service charge when he presents a NSF check, the depositor has no statutory or contractual obligation to refrain from drawing checks for amounts in excess of the balance in his account. (Cal. U. Com. Code, § 4401.)" (Pp. 968-969; accord, *Shapiro v. United California Bank* (1982) 133 Cal.App.3d 256, 262 [184 Cal.Rptr. 34].)

We cannot entirely agree with *Hoffman* and *Shapiro* that the contract between the bank and the depositor treats an overdraft as an application for advance credit. The contract in fact is silent on the characterization of an NSF check, and the bank is aware that a depositor often writes overdrafts in the mistaken belief that he has, or will have, sufficient funds to cover the check, and without any intent to apply for credit.[18] We agree with those decisions, however, that because the depositor has never agreed to refrain from writing NSF checks, the writing of such a check is not a breach of contract. The fee that the bank may charge for processing such a check is limited by principles of good faith, reasonableness, unconscionability, and the like, but it is not limited to the amount which a bank could recover in a suit for breach of contract. We conclude that the court correctly sustained the demurrer to plaintiff's fifth cause of action without leave to amend.

V. *Whether California law, as applied to NSF charges imposed by national banks, is preempted by federal law.*

Defendant contends that the provisions of California law on which plaintiff bases his causes of action are preempted by federal law. Since we have concluded that plaintiff's complaint states no cause of action for recovery of penalties under Civil Code section 1671, we do not discuss whether federal law preempts application of that section to banking charges. Instead, we focus our discussion on whether California law is preempted to the extent that it prohibits banks from exacting unreasonable charges (a doctrine applicable only when the contract does not expressly fix the charge) or enforcing unconscionable provisions (a doctrine applicable to all contracts).[19]

---

[18]Contrary to the contention of the bank, such overdrafts are not necessarily the result of carelessness by the depositor; they may be the result of bank delay in crediting a deposit or of bank dishonor of an NSF check submitted for deposit under a reasonable belief that the check was good.

[19]We note preliminarily that defendant appears to assume that if state law is preempted, federally chartered banks are free to enforce unconscionable contracts. We question that assumption; we believe that a federal court, deciding federal common law, might choose to follow the lead of the state courts and legislatures and limit the power of banks to enforce oppressive contracts. In particular, we suggest that the provisions of the Uniform Commercial Code, now in effect in 49 states, express a national consensus that courts should have the power to avoid unfair and oppressive contractual provisions. We need not decide ques-

No provision of federal law discusses bank charges for NSF checks, or, for that matter, bank charges for any service performed for depositors. No federal statute considers whether provisions in contracts between banks and their customers may exact unreasonable or unconscionable fees. Defendant's preemption argument, consequently, is essentially an argument that even though the federal government has largely declined to regulate this area,[20] Congress has nevertheless decided to preclude state regulation.

Defendant cites various statutes and a newly promulgated administrative regulation as a basis for preemption. First, it refers to the National Bank Act of 1864, 13 Statutes at Large 99. Section 24 of this act (12 U.S.C. § 24) grants national banks general corporate powers upon proper filing of articles of association and an organizational certificate. Paragraph 7 empowers the board of directors or duly authorized officers or agents to exercise "all such incidental powers as shall be necessary to carry on the business of banking . . . by receiving deposits . . . ." Defendant asserts that the power to receive deposits necessarily includes the power to control related charges, and hence that such charges are exempt from state law. **(17)** **(See fn. 21.)** Amicus California Bankers Association also points to the statutory requirement that bank directors refrain from any "unsafe or unsound practice" (12 U.S.C. § 1818(e)), and argues that a charge for NSF checks low enough to avoid an attack as unconscionable or penal might be inadequate to discourage the writing of such checks, and thus constitute an unsound practice.[21]

---

tions of federal common law, however, because we have concluded that absent an evidentiary showing that the challenged state laws will impair the efficiency of national banks or their ability to perform their duties—which showing cannot be made by demurrer—federal law asserts no preemptive effect in this case.

[20]The Comptroller of the Currency could enjoin a bank service charge, or any other act of a national bank, which he considered an unsafe or unsound practice. (12 U.S.C. § 1818(b).) To our knowledge, this authority has never been used to curb excessive bank charges.

[21]Defendant also cites 12 United States Code section 484, which provides that "[n]o national bank shall be subject to any visitorial powers except as authorized by Federal law." Cases construing this section do not make clear when an unauthorized person or agency may, without violating this section, examine bank records for a limited purpose. (Compare *Guthrie* v. *Harkness* (1905) 199 U.S. 148, 157-159 [50 L.Ed. 130, 133-134, 26 S.Ct. 4] [stockholder may inspect to determine the value of his stock] and *Peoples Bank of Danville* v. *Williams* (D.Va. 1978) 449 F.Supp. 254, 259-260 [Securities Exchange Commission may inspect to detect fraud in sale of bank stock] with *National State Bank, Elizabeth N.J.* v. *Long* (3d Cir. 1980) 630 F.2d 981, 989 [57 A.L.R.Fed. 308] [state commissioner may not inspect to enforce law against "redlining"].) Thus, it is possible that section 484 may serve to limit plaintiff's ability to examine records by way of discovery, or to subpoena such records at trial. Difficulties in proof, however, are irrelevant in ruling upon a demurrer. Since the bank can comply with California law without violating section 484, and plaintiff can state a cause of action for violation of such law without violating section 484, we find no present conflict between state law and section 484. Plaintiff will simply have to prove his case without using methods which violate that section.

Next, defendant cites the Depository Institutions Deregulation Act of 1980, 94 Statutes at Large 132 (hereafter 1980 Act) and the Garn-St. Germain Depository Institutions Act of 1982, 96 Statutes at Large 1469 (hereafter 1982 Act). The 1980 and 1982 Acts aimed at the gradual removal of federal regulations limiting the interest banks could pay to depositors. The 1980 Act also preempted state usury laws to the extent that they limited the interest banks could collect on mortgages, but left intact state limits on other loan charges. Apart from that provision, neither act expressly preempts state law; neither discusses bank charges for NSF checks or other depositor services. Defendant nevertheless argues that Congress contemplated that after deregulation, banks would pay higher interest to depositors, and raise charges for services previously subsidized by the below-market interest rates on deposit accounts. Further, defendant claims, Congress intended such charges to be set in a competitive market free of regulation.

Finally, defendant relies on a regulation promulgated by the Comptroller of the Currency just prior to argument in the present case.[22] The new regulation, effective December 2, 1983, amends 12 Code of Federal Regulations section 7.8000, which previously provided only that "[a]ll charges to customers should be arrived at by each bank on a competitive basis and not on the basis of any agreement, arrangement, undertaking, understanding or discussion among banks or their officers." As subsequently amended March 19, 1984, the new regulation adds subdivisions (b) and (c) to section 7.8000, to read as follows:

"(b) Establishment of deposit account service charges, and the amounts thereof, is a business decision to be made by each bank according to sound banking judgment and federal standards of safety and soundness. In establishing deposit account service charges, the bank may consider, but is not limited to considering: [¶] (1) Costs incurred by the bank, plus a profit margin, in providing the service; [¶] (2) The deterrence of misuse by customers of banking services; [¶] (3) The enhancement of the competitive position of the bank in accord with the bank's marketing strategy; [¶] (4) Maintenance of the safety and soundness of the institution.

"(c) A national bank may establish any deposit account service charge pursuant to paragraphs (a) and (b) of this section notwithstanding any state laws which prohibit the charge assessed or limit or restrict the amount of that charge. Such state laws are preempted by the comprehensive federal

---

[22]Plaintiff charges that this regulation was promulgated to influence the decision of the court in the present case. We find no impropriety in an administrative agency issuing a regulation to clarify its position on contested issues in pending litigation.

statutory scheme governing the deposit-taking function of national banks."[23]

■■ ■■■■ The parties dispute whether the regulation is legislative or interpretative in character.[24] Plaintiff contends that it is legislative, and hence invalid because the Comptroller failed to comply with the notice and hearing requirements of the Administrative Procedure Act (5 U.S.C. § 553). ■■ ■■ ■■■■ Defendant maintains that it falls within the Administrative Procedure Act's exception for "interpretative rules" (5 U.S.C. § 553(b)(3)(A)).[25] ■■ ■■ ■■ ■■ As an interpretative regula-

---

[23]The regulation as promulgated on November 28, 1983, differed from the present version in two respects. First, subdivision (b), after stating that the setting of deposit account charges is a business decision made by each bank, added "and the Office will not substitute its judgment." According to the statement published in connection with the March 1984 amendment, this language was eliminated to avoid the implication that the Comptroller would not review bank service charges to determine whether they represented sound banking practice. (See 49 Fed. Reg. 28237 (July 11, 1984).) Second, former subdivision (c) asserted that state laws limiting banking service charges "impair the efficiency of national banks and conflict with the regulatory scheme governing the national banking system and are preempted by federal law." The present regulation asserts that such state laws "are preempted by the comprehensive federal statutory scheme governing the deposit-taking function of national banks." According to the Comptroller's statement, the language was changed to avoid any inference that the regulation itself, and not the statutes it purports to interpret, preempted state law. (*Ibid.*) We note, however, that the March amendment also changes the basis for preemption from the actual effect of state laws upon the federal program to the claim that the federal statutory scheme so occupies the field as to exclude state regulation.

[24]"Generally speaking, it seems to be established that 'regulations,' 'substantive rules' or 'legislative rules' are those which create law, usually implementary to an existing law; whereas interpretative rules are statements as to what the administrative officer thinks the statute or regulation means." (*Gibson Wine Co.* v. *Snyder* (D.C.Cir. 1952) 194 F.2d 329, 331.) Interpretative "rules are essentially hortatory and instructional. . . . By merely clarifying the law's terms as applied situationally, interpretative or administrative-type rules are used more for discretionary fine-tuning than for general law making." (*Alcarez* v. *Block* (9th Cir. 1984) 746 F.2d 593, 613.)

[25]"The APA's prescription of notice and comment procedures for agency rulemaking, 5 U.S.C. § 553, together with its broad definition of what amounts to a 'rule,' U.S.C. § 551(4), reflect a commitment 'to re-introduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies.' *Batterton* v. *Marshall*, 648 F.2d 694, 703 (D.C.Cir. 1980) (footnote omitted). Among the limited exceptions to the general notice and comment requirement is the exemption for 'interpretive rules,' 5 U.S.C. § 553(b)(3)(A). This exemption, like the others, is to be narrowly construed. *Humana of South Carolina, Inc.* v. *Califano*, 590 F.2d 1070, 1082 (D.C.Cir. 1978)." (*Credit Union National Association* v. *National Credit Union Administration Board* (D.D.C. 1983) 573 F.Supp. 586, 591.)
Consequently, the Comptroller's decision to characterize his regulation as interpretative is not dispositive. (*Columbia Broadcasting System, Inc.* v. *United States* (1942) 316 U.S. 407, 416 [86 L.Ed. 1563, 1570, 62 S.Ct. 1194]; *Louisiana-Pacific Corp.* v. *Block* (9th Cir. 1982) 694 F.2d 1205, 1210; *Credit Union National Association* v. *National Credit Union Administration Board, supra,* 573 F.Supp. 586, 591.) Courts inquire also into the function of the regulation in the administrative structure (see *British Caledonian Airways, Ltd.* v. *C.A.B.* (D.C.Cir. 1978) 584 F.2d 982, 994; *Joseph* v. *United States Civil Service Commission* (D.C.Cir. 1977) 554 F.2d 1140, 1153), and into its foreseeable effect (*Louisiana-*

tion, section 7.8000 would be entitled to consideration and weight, but would not be binding on the courts.[26]

We now turn to the question whether the foregoing statutes preempt application of California law in the case at bar. ■ As the United States Supreme Court explained in *Silkwood* v. *Kerr-McGee Corp.* (1984) 464 U.S. 238 [78 L.Ed.2d 443, 104 S.Ct. 615], "state law can be preempted in either of two general ways. If Congress evidences an intent to occupy a given field, any state law falling within that field is preempted. [Citations.] If Congress has not entirely displaced state regulation over the matter in question, state law is still preempted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law [citation], or where the state law stands as an obstacle to the

*Pacific Corp.* v. *Block, supra,* 694 F.2d 1205, 1210; *Chamber of Commerce* v. *O.S.H.A.* (D.C.Cir. 1980) 636 F.2d 464, 469). It appears now to be generally agreed that proof that a regulation will have a "substantial impact" is not itself sufficient to require classifying that regulation as legislative in character, but that such impact is a proper factor for judicial consideration. (See *Cabais* v. *Egger* (D.C.Cir. 1982) 690 F.2d 234, 237.)

There is one exception to the foregoing principles: if the agency labels the regulation as legislative and promulgates it in accord with the requirements of the Administrative Procedure Act, then the regulation has the authority of a legislative rule even though it arguably constitutes only an interpretation of statutory law. (Cf. *Levesque* v. *Block* (1st Cir. 1983) 723 F.2d 175, 181-182.)

[26]Interpretative rules, "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a [ruling] in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." (*Skidmore* v. *Swift & Co.* (1944) 323 U.S. 134, 140 [89 L.Ed. 124, 129, 65 S.Ct. 161]; *General Electric Co.* v. *Gilbert* (1976) 429 U.S. 125, 141-142 [50 L.Ed.2d 343, 358, 97 S.Ct. 401].)

Other cases note that greater weight is given to an interpretation by an agency charged with the duty of administering the statute in question (*Red Lion Broadcasting Co.* v. *FCC* (1969) 395 U.S. 367, 381 [23 L.Ed.2d 371, 383-384, 89 S.Ct. 1794]), particularly if the agency took part in the formulation of the statute (*Miller* v. *Youakim* (1979) 440 U.S. 125, 144 [59 L.Ed.2d 194, 208, 99 S.Ct. 957]), promulgated its interpretation contemporaneously with the enactment of the statute (see *General Electric Co.* v. *Gilbert, supra,* 429 U.S. 125, 142 [50 L.Ed.2d 343, 358]), or represents a consistent administrative construction of the act (*ibid.*). In the present case, these factors fall on both sides of the line. The Comptroller is charged with the execution of the relevant statutes. He took part in the drafting of the 1980 and 1982 Acts, and issued the regulation within a short time of the enactment of the later act. The regulation, on the other hand, is plainly not contemporaneous with the enactment of the National Bank Act. It does not represent a consistent administrative interpretation, since previous actions by the office of the Comptroller have not taken a consistent stand. (Defendant calls our attention to a letter from the Comptroller to the Chairman of the Legal and Monetary Affairs Subcommittee of the House of Representatives Committee on Governmental Affairs, dated Nov. 5, 1963, stating a preference for bank service charges set by free competition instead of local regulation. The letter does not purport to be interpreting existing statutes, or suggest that those statutes, without supplementary legislation, preempt state regulation. Plaintiff refers to an Aug. 27, 1977, letter from the Legal Advisory Services Division of the Comptroller's office stating that state limitations on service charges are not preempted.)

accomplishment of the full purposes and objectives of Congress . . . ." (464 U.S. at p. 248 [78 L.Ed.2d at p. 452]; accord, *Pac. Gas & Electric* v. *St. Energy Resources Conserv.* (1983) 461 U.S. 190, 203-204 [75 L.Ed.2d 752, 764-765, 103 S.Ct. 1713, 1722].) Defendant bears the burden of persuasion on this issue; "[c]ourts are reluctant to infer preemption, and it is the burden of the party claiming Congress intended to preempt state law to prove it." (*Elsworth* v. *Beech Aircraft Corp.* (1984) 37 Cal.3d 540, 548 [208 Cal.Rptr. 874, 691 P.2d 630] and cases there cited.)

 Defendant contends that Congress, by comprehensive regulation, has occupied the field of regulation of contracts between national banks and their depositors. One hundred and fifteen years of practice under the national banking system argue to the contrary. While nationally chartered banks are subject to the paramount authority of the United States,[27] Congress has declined to provide an entire system of federal law to govern every aspect of national bank operations. Consequently, national banks have traditionally been "governed in their daily course of business far more by the laws of the State than of the Nation. All their contracts are governed and construed by State laws." (*National Bank* v. *Commonwealth* (1870) 76 U.S. (9 Wall.) 353, 362 [19 L.Ed. 701, 703]; see Scott, *The Dual Banking System: A Model of Competition in Regulation* (1977) 30 Stan.L.Rev. 1.)[28] As explained in *National State Bank, Elizabeth, N.J.* v. *Long, supra,* 630 F.2d 981, "[w]hatever may be the history of federal-state relations in other fields, regulation of banking has been one of dual control since the passage of the first National Bank Act in 1863. . . . In only a few instances has Congress explicitly preempted state regulation of national banks. More commonly, it has been left to the courts to delineate the proper boundaries of federal and state supervision. [¶] The judicial test has been a tolerant one. [National banks'] right to contract, collect debts, and acquire and transfer property are all based on state law." (P. 985.) Thus the rule is that state laws apply, "the exception being the cessation of the operation of such laws whenever they expressly[29] conflict with the laws of the United States or frustrate the

---

[27]*Davis* v. *Elmira Savings Bank* (1896) 161 U.S. 275, 283 [40 L.Ed. 700, 701, 16 S.Ct. 502]. Under our dual banking system, commercial banks have the option of being federally or state chartered. Federally chartered (national) banks are governed by the National Bank Act of 1874 (12 U.S.C. § 21 et seq.) which sets forth chartering criteria, basic banking and investment powers, lending and borrowing limitations, and corporate powers and duties. As required members of the Federal Reserve System and insured of the Federal Deposit Insurance Corporation (FDIC), national banks are also subject to the Federal Reserve Act (12 U.S.C. §§ 221-530), and the FDIC Act (12 U.S.C. § 1811 et seq.).

[28]Courts have routinely applied state contract law in cases involving national banks. See, e.g., *Wichita Eagle & Beacon Publishing Co. Inc.* v. *Pacific Nat'l Bank* (9th Cir. 1974) 493 F.2d 1285; *Fowler* v. *Security First National Bank* (1956) 146 Cal.App.2d 37 [303 P.2d 565]; *Security First National Bank* v. *Rospaw* (1951) 107 Cal.App.2d 220 [237 P.2d 76].

[29]The Supreme Court has at times preempted state law on the basis of an implied, rather than an express, conflict. (Compare, *Franklin Nat'l Bank* v. *New York* (1954) 347 U.S. 373 [98 L.Ed. 767, 74 S.Ct. 550] with *Davis* v. *Elmira Savings Bank, supra,* 161 U.S. 275.)

purpose for which the national banks were created, or impair their efficiency to discharge [their] duties . . . ." (*McClellan* v. *Chipman* (1896) 164 U.S. 347, 357 [41 L.Ed. 461, 465, 17 S.Ct. 85].)[30]

The assertion in the regulation that state laws limiting bank service charges "are preempted by the comprehensive federal statutory scheme governing the deposit-taking function of national banks" (12 C.F.R. § 7.8000, subd. (c)) is palpably erroneous. There is no comprehensive federal statutory scheme governing the taking of deposits. There is one relevant statute, section 24 of the National Bank Act, and that merely authorizes banks to accept deposits. Section 24 may by implication also authorize banks to charge for deposit-related services as an incidental power necessary to carry on the business of receiving deposits, but such implied authority does not constitute a regulatory scheme so comprehensive as to displace state law.[31]

Under the Comptroller's interpretation, any banking matter related to deposits would be exempt from state law. The result would be far-reaching and extremely disruptive. Currently, California and most other states extensively regulate all banks within their territory. For example, article 4 of the Uniform Commercial Code (codified at Cal. U. Com. Code, §§ 4101-4407), entitled "Bank Deposits and Collections" has been adopted in 49 states and is routinely applied to national banks.[32] Also, numerous provisions of the California Financial Code regulate deposit-related practices.[33]

---

[30]This rule has been consistently followed over the years. *Lewis* v. *Fidelity & Deposit Co.* (1934) 292 U.S. 559, 566 [78 L.Ed. 1425, 1431, 54 S.Ct. 848, 92 A.L.R. 794]; *First Nat'l Bank* v. *Missouri* (1924) 263 U.S. 640 [68 L.Ed. 486, 44 S.Ct. 213]; *Nat'l State Bank* v. *Long* (3d Cir. 1980) 630 F.2d 981, 985-986; *Brown* v. *United Community Nat'l Bank* (D.D.C. 1968) 282 F.Supp. 781, 783; *South Dakota* v. *Nat'l Bank* (D.S.D. 1963) 219 F. Supp. 842, 844-845, affirmed (8th Cir. 1964) 335 F.2d 444, certiorari denied (1965) 379 U.S. 970 [13 L.Ed.2d 562, 85 S.Ct. 667]. The test has sometimes been phrased more loosely; see, e.g., *Anderson Nat'l Bank* v. *Luckett* (1944) 321 U.S. 233, 248 [88 L.Ed. 692, 705, 64 S.Ct. 599, 151 A.L.R. 824] ("national banks are subject to state laws, unless those laws infringe the national banking laws or impose an undue burden on the performance of the banks' functions").

[31]Cf. *Joy* v. *North* (D.Conn. 1981) 519 F.Supp. 1312, 1323, reversed on other grounds (2d Cir. 1982) 692 F.2d 880, certiorari denied, *Citytrust* v. *Joy* (1983) 460 U.S. 1051 [75 L.Ed.2d 930, 103 S.Ct. 1498]. *Joy* rejected the argument that section 24's granting of general corporate powers preempts state corporation law: "This section [12 U.S.C. § 24] simply sets forth the general corporate powers of associations. It does not provide that the powers therein are meant to preempt state law."

[32]See, e.g., *Bullis* v. *Security Pacific Nat'l Bank, supra,* 21 Cal.3d 801 (§ 4103); *Security Pacific National Bank* v. *Associated Motor Sales* (1980) 106 Cal.App.3d 171 [165 Cal.Rptr. 38] (§§ 4301, 4212); *Fireman's Fund Insurance Co.* v. *Security Pacific Nat'l Bank* (1978) 85 Cal.App.3d 797 [149 Cal.Rptr. 883] (§§ 4202, 4207, 4401); *Bank of America* v. *Security Pacific Nat. Bank* (1972) 23 Cal.App.3d 638 [100 Cal.Rptr. 438] (§ 4308).

[33]For example, chapters 7 and 8 of the Financial Code contain the following provisions affecting deposits: Section 850 (minors), section 851 (married person), section 852 (joint accounts), section 852.5 (pay-on-death provisions), section 860 (public official as officer of

Financial Code section 100 specifically subjects national banks to its provisions insofar as those provisions do not conflict with federal law. The Comptroller's interpretation would suddenly exempt national banks from many, if not all, of these regulatory measures. There is nothing to suggest that Congress, by authorizing national banks to receive deposits, intended such a result.

The United States Supreme Court decisions construing section 24 do not support the Comptroller's expansive interpretation. Instead, whether upholding or preempting the state law, the court has focused on the narrow issue of whether the state law impeded the bank's ability to receive deposits. For example, *Franklin Nat'l Bank* v. *New York* (1954) 347 U.S. 373 [98 L.Ed. 767, 74 S.Ct. 550] held that a New York statute which prohibited all banks except nonprofit state chartered banks from using the term "savings" in their advertising, conflicted with the national bank's authorization to receive deposits.[34] Emphasizing the importance of advertising in competing for deposits, the court reasoned that the statute interfered with the bank's ability to receive deposits. "[W]e [cannot] construe the [National Bank Act and the Federal Reserve Act] as permitting only a passive acceptance of deposits thrust upon them. Modern competition for business finds advertising one of the most usual and useful of weapons." (*Id.*, at p. 377 [98 L.Ed. at pp. 773-774].)

Similarly, in another case the court found that a California law which automatically escheated dormant accounts to the state was preempted by section 24 because it impeded the bank's ability to attract deposits. (*First National Bank* v. *California* (1923) 262 U.S. 366 [67 L.Ed. 1030, 43 S.Ct. 602].) But as the court later explained in *Anderson Nat'l Bank* v. *Luckett, supra,* 321 U.S. 233, 250 [88 L.Ed. 692, 706-707], not all state escheat laws are preempted: "[The] decision [in *First Nat'l*] turned . . . on the effect of the state statute in altering the contracts of deposit in a manner considered so unusual and so harsh in its application to depositors as to deter them from placing or keeping their funds in national banks."[35] No-

depository of public funds), section 863 (penalties for failure to deposit), sections 865.2 and 865.4 (disclosure of consumer bank account charges), section 874 (dormant accounts), sections 953, 954, 970, 971 (withdrawals and collections).

[34]In addition to section 24 of the National Bank Act, the court also relied on the Federal Reserve Act which provides that a national bank "may continue . . . to receive time and savings deposits . . . ." (12 U.S.C. § 371.)
 The purpose of the New York statute was to prevent consumer confusion between commercial banks and the state chartered institutions which pay larger returns on deposits.

[35]In *Anderson,* the court found a Kentucky law requiring transfer of abandoned, as opposed to merely dormant, accounts to the state was not preempted by section 24. "We cannot say that the protective custody of long inactive bank accounts, for which the Kentucky statute provides, and which in many circumstances may operate for the benefit and security of depositors . . . will deter them from placing their funds in national banks in that state." (*Id.*, at p. 252 [88 L.Ed. at pp. 707-708].)

where did the court suggest that section 24 preempts all state regulation of deposit-related matters.

In an attempt to bring itself within these cases, defendant argues that *Franklin* in particular implies that all terms and conditions upon which national banks may compete for deposits are presumed to be the exclusive province of federal law. This reading of *Franklin* is unduly broad. *Franklin* preempted the New York law because of its deterrent effect on deposits. This holding does not logically extend into the broader proposition that every possible term or practice which may be the subject of competition between banks is beyond the reach of state law. As the numerous regulations cited earlier demonstrate, it is possible for states to regulate such "terms or conditions" without impeding banks' ability to attract deposits. And in the present setting, it is difficult to believe that persons would be deterred from depositing in federally chartered banks by the knowledge that such banks, like their state chartered counterparts, were prohibited by state law from enforcing unreasonable charges or unconscionable contracts.[36]

If the National Bank Act does not displace state regulation of bank service charges, the additional enactment of the 1980 and 1982 Acts adds nothing. As we have seen, these statutes do not mention bank service charges; neither separately nor in combination with the National Bank Act can they be described as a comprehensive scheme regulating such charges. Moreover, when in the 1980 Act Congress expressly preempted state usury laws, it deliberately left in effect other provisions of state law regulating charges in contracts between banks and borrowers.[37] It is not plausible that the same

---

[36]The bank's reliance on *Fidelity Federal Savings & Loan Ass'n* v. *de la Cuesta* (1982) 458 U.S. 141 [73 L.Ed.2d 664, 102 S.Ct. 3014] is also misplaced. As defendant concedes, the court in that case identified an express conflict between our decision in *Wellenkamp* v. *Bank of America* (1978) 21 Cal.3d 943 [148 Cal.Rptr. 379, 582 P.2d 970], which invalidated "due-on-sale" clauses as unreasonable restraints on alienation, and a Federal Home Loan Bank Board *legislative* regulation which provided that federal savings and loans have the power to include and enforce "due-on-sale" clauses in their loan instruments. (12 C.F.R. § 545.8-3(f) (1982).) Relying largely on the regulation's preamble, which stated that "due-on-sale" practices should be governed by federal law and not subject to conflicting state law, the court found the board's intent to preempt *Wellenkamp* was unambiguous and unequivocal. Thus the court's holding was clearly based upon a finding of an express conflict and an unambiguous intent to preempt state law, neither of which is present here.

Nevertheless, defendant makes the unfounded assertion that the court also held that state law is preempted, even in the absence of a direct conflict, on the strength of the federal interest in the financial well-being of federally chartered banking institutions. The court expressly noted that because it found a direct conflict, it did not reach the issue of whether Congress has occupied the entire field of federally chartered savings and loans, much less national banks.

[37]The Senate committee report on the 1980 Act states that "[i]n exempting mortgage loans from state usury limitations, the Committee intends to exempt only those limitations that are included in the annual percentage rate. The Committee does not intend to exempt limitations

Congress intended by silence to preempt all state laws regulating charges in contracts between banks and depositors.

We conclude that the Comptroller's assertion that state laws regulating service charges are preempted by a "comprehensive federal statutory scheme governing the deposit-taking function of national banks" (12 C.F.R. § 7.8000) is not a reasonable interpretation of the controlling statutes. ██ ██ It is not an attempt to interpret the language of the statute,[38] fill in the gaps in the statutory coverage,[39] or to explain how the Comptroller will exercise his discretion.[40] Instead, the regulation, insofar as it claims federal preemption, represents legislation of far-reaching character and effect, of a type never considered by Congress, which would radically alter the respective roles of the states and the Comptroller in the regulation of bank-depositor contracts. Such legislation cannot be enacted in the guise of statutory interpretation.[41]

---

on prepayment charges, attorney fees, late charges or similar limitations designed to protect borrowers." (Sen. Rep. No. 96-368, 1st Sess., p. 19 (1979).) Thus the committee intended to leave many features of the contract between a bank and a borrower to be governed by state law, including state provisions which placed a limit on the amount the bank could charge.

[38]In determining whether a regulation represents a reasonable interpretation, the courts look initially to the plain meaning of the statutory language. (See, e.g., *Addison* v. *Holly Hill Co.* (1944) 322 U.S. 607, 617-618 [88 L.Ed. 1488, 1496, 64 S.Ct. 1215, 153 A.L.R. 1007]; *Cabais* v. *Egger* (D.C.Cir. 1982) 690 F.2d 234, 238.) In *State of N.J.* v. *Department of Health & Human Services* (3d Cir. 1981) 670 F.2d 1262 at page 1283, footnote 17, when the court upheld a regulation as a reasonable statutory interpretation, it distinguished an earlier case, *Reser* v. *Califano* (W.D.Mo. 1979) 467 F.Supp. 446, on the ground that " '[t]he Agency in *Reser* did not purport to derive the prohibition . . . from any specific language in the Act.' "

[39]Compare *Ford Motor Credit Co.* v. *Milhollin* (1980) 444 U.S. 555, 566 [63 L.Ed.2d 22, 31, 100 S.Ct. 790], upholding intersticial administrative regulations; 2 Davis, Administrative Law Treatise (2d ed. 1979) section 7.11. The decision of the Court of Appeal in *Chamber of Commerce of the United States* v. *O.S.H.A., supra,* 636 F.2d 464, illustrates the limits on the use of interpretative rules to fill in legislative gaps. Holding invalid a rule requiring "walkaround pay," the court said that "[t]he Administration could not be explaining or clarifying the Act's language, for . . . the Act neither prohibits nor compels pay for walkaround time. . . . Congress has not 'legislated and indicated its will' on the question of walkaround pay, therefore the Administration must have done more than exercise its ' "power to fill up the details." ' . . . [¶] . . . It is clear to us that the Administration has attempted through this regulation to supplement the Act, not simply to construe it, and therefore the regulation must be treated as a legislative rule." (P. 469.)

[40]Compare *Guardian Federal S & L* v. *Federal S & L Ins. Corp.* (D.C.Cir. 1978) 589 F.2d 658, 664; 2 Davis, *op. cit. supra,* section 7.15.

[41]During the 1960's the Comptroller issued a number of interpretative regulations which purported to interpret the provision of section 24 of the National Bank Act authorizing banks to conduct activities "convenient or useful" to the business of banking, to permit banks to engage in data processing, auto leasing, travel agent services and armored car services. The courts consistently held such regulations invalid. (See *Arnold Tours, Inc.* v. *Camp* (1st Cir. 1972) 472 F.2d 427, and cases cited p. 436, fn. 12.) We find an analogy to the present case, in which the Comptroller is also seeking to construe very general language in section 24 to achieve a specific purpose not within the contemplation of Congress.

Thus the application of state law to bank service charges is not preempted by a comprehensive federal statutory scheme which occupies the field. We therefore turn to the second preemption issue, whether the application of state law in this case will create an actual conflict with federal law in the sense that "it is impossible to comply with both state and federal law." (*Silkwood* v. *Kerr-McGee Corp., supra,* 464 U.S. 238, 248 [78 L.Ed.2d 443, 452].) As we have noted, no provision of federal law discusses bank service charges in general or bank charges for NSF checks in particular. Amicus California Bankers Association nevertheless points to a possibility of actual conflict. Bank directors, it observes, are required to refrain from engaging "in any unsafe or unsound practice." (12 U.S.C. § 1818(e).) Conceivably directors might believe a charge for NSF checks low enough to avoid attack as unreasonable or unconscionable might fail to discourage the writing of NSF checks, and thus constitute an unsafe or unsound practice.

Amicus' argument proves too much, for if the mere possibility that bank directors might deem compliance with a state law to be unsound banking practice was enough to preempt the state law, the dual system of banking regulation would disappear. We recognize, of course, that in the unlikely event of actual conflict, banks must follow the federal requirements. But such actual conflict is a remote and unlikely possibility; a contractual term must be overreaching and oppressive before it is denominated "unreasonable" or "unconscionable." Surely sound banking practices would rarely, if ever, require the enforcement of oppressive contracts.[42]

Finally, we come to the question whether the application of state law will stand as an obstacle to the accomplishment of the full purposes Congress sought to achieve. Defendant's argument on this matter centers on the 1980 and 1982 Acts discussed earlier in this opinion. (*Ante,* p. 934.) As we there noted, these acts provided for gradual removal of federal regulations limiting interest paid depositors, but, apart from preempting state usury laws, did not expressly discuss the role of state regulation. Neither act mentions charges for services to depositors.

The extensive legislative history of the acts shows that Congress expected deregulation to lead banks to pay higher interest to depositors, ending the bank's ability to subsidize depositor services by paying below-market interest on deposits. Thus, Congress clearly anticipated that banks would be able to charge fees for depositor services sufficient to recover the cost of such

---

[42]Under the Comptroller's regulation, in setting fees for services bank may consider (1) costs plus a profit margin, (2) the deterrence of misuse of banking services, (3) the enhancement of the bank's competitive position, and (4) maintenance of the safety and soundness of the bank. These same factors could be considered by a court in deciding whether a fee was unreasonable or unconscionable.

services. Arguably a state law which required that services be offered free, or below cost, would frustrate the congressional intent by preventing the bank from paying market interest to depositors.

The state laws in question, however, permit the bank to charge fees sufficient to recover the cost of the services and a reasonable profit. We find nothing in the legislative history to suggest that Congress thought it essential that the banks be able to charge more. While an excessive charge for depositor services might help the economic status of a bank, and could enable it to subsidize interest payments and pay above-market interest, we find no indication that such is essential to the congressional purpose.

Defendant also argues that underlying both the 1980 and 1982 Acts is the philosophy that service charges as well as interest rates should be set by market forces, not government regulation.[43] Defendant's argument mistakes the purpose of the provisions of state law at issue here. Those provisions are part of the common law governing all commercial transactions; they regulate not only sale of bank services but the sale of groceries, automobiles, furniture or medical services. The duty of good faith and fair dealing, and protection against unconscionable contracts, has never been thought incompatible with a free and competitive market. Defendant is really asking for a market free of those restraints against oppression and overreaching applicable to all other commercial operations. We find no indication that Congress envisioned not only a free and competitive market, but one freer than any other market.

In sum, the controlling doctrines of California law do not facially conflict with any federal statute or regulation. Neither does it appear from the pleading that the application of these doctrines to national bank contracts will impair the efficiency or viability of national banks, or frustrate the purpose of legislation regulating (or deregulating) those banks. Although conceivably information not contained in the pleadings might lead to a different conclusion, such information is not before us in reviewing a judgment upon demurrer. We cannot presume, without evidence, that prohibiting a national bank from setting unreasonable prices or enforcing an unconscionable con-

---

[43]Defendant consistently assumes throughout its argument that because its charges for processing NSF charges are within the range of fees charged by its competitors, its fees are the product of a free and competitive market. The conclusion does not follow from the premise. It may well be, as plaintiff charges, that banks do not compete in the setting of NSF check fees, but set fees arbitrarily, deterred only by the desirability of minimizing customer dissatisfaction.

tract will render that bank less efficient, less competitive or less able to fulfill its function in a national banking system.[44]

VI. *Conclusion.*

Plaintiff's second and third causes of action state grounds for relief without need for further amendment; his first and fourth causes of action can be amended to state such grounds. The fifth cause of action alone is fatally defective. We conclude that the trial court erred in sustaining defendant's demurrer without leave to amend and in entering judgment for defendant.

The judgment is reversed, and the cause remanded to the superior court for further proceedings consistent with this opinion.

Bird, C. J., Mosk, J., Reynoso, J., White, J.,* Breiner, J.,* and Savitt, J.,* concurred.

Respondent's petition for a rehearing was denied August 15, 1985. Kaus, J., and Grodin, J., did not participate therein.

---

[44]Plaintiff's fourth cause of action charged the bank with unfair and deceptive practices. We have concluded that this cause of action is uncertain, and until the uncertainty is clarified, and the alleged unfair or deceptive practices specified, we cannot determine whether that cause of action is barred by federal law. We note, however, that although many federal statutes and regulations deal with the subject of unfair competition and deceptive practices, such statutes and regulations generally coexist peacefully with state laws regulating the same activity. (Cf. *People* v. *Western Airlines* (1984) 155 Cal.App.3d 597 [202 Cal.Rptr. 237], cert. den. *sub nom. California* v. *Western Airlines* (1985) — U.S. — [83 L.Ed.2d 808, 105 S.Ct. 815].)

*Assigned by the Chairperson of the Judicial Council.