61 Cal.Rptr.3d 344 (2007)
152 Cal.App.4th 571
Bruce GATTON et al., Plaintiffs and Respondents,
v.
T-MOBILE USA, INC., Defendant and Appellant.
Christina Nguyen et al., Plaintiffs and Respondents,
v.
T-Mobile USA, Inc., Defendant and Appellant.
Nos. A112082, A112084.
Court of Appeal of California, First District, Division Five.
June 22, 2007.
*346 Franklin & Franklin and J. David Franklin, San Diego; Lerach Coughlin Stoia Geller Rudman & Robbins and Jacqueline E. Mottek, San Francisco; Bramson, Plutzki, Mahler & Birkheuser, Alan R. Plutzik, Walnut Creek, and Lawrence Timothy Fisher for Plaintiffs and Respondents.
Bingham McCutchen, Christopher B. Hockett, Thomas S. Hixson and Tanya King Dumas, San Francisco, for Defendant and Appellant.
CERTIFIED FOR PARTIAL PUBLICATION.[*]
*345 GEMELLO, J.
In this consolidated appeal, T-Mobile USA, Inc. appeals from an order denying its motion to compel arbitration of actions challenging the early termination fee charged to cellular telephone service subscribers and challenging the practice of selling locked handsets that a subscriber cannot use when switching carriers. Mobile contends the court erred in concluding *347 that the arbitration clause in its service agreement is unconscionable.
In the published portion of this opinion, we hold that the adhesive nature of the service agreement established a minimal degree of procedural unconscionability notwithstanding the availability of market alternatives and that the high degree of substantive unconscionability arising from the class action waiver rendered the arbitration provision unenforceable.
In the unpublished portion of this opinion, we reject T-Mobile's contention that the Federal Arbitration Act preempts any rule that class action waivers are unconscionable under California law.
We affirm the trial court order.
FACTUAL AND PROCEDURAL BACKGROUND

The Parties and the Service Agreements
T-Mobile USA, Inc. (T-Mobile) is a cellular telephone provider in California. Plaintiffs are or were subscribers to Mobile.[1]
All plaintiffs executed service agreements drafted by T-Mobile. Each agreement incorporated terms and conditions drafted by T-Mobile.[2] Directly above the signature line in the service agreement executed by plaintiffs is a short paragraph stating, "By signing below, you acknowledge you .... have received a copy of this Agreement.... You also acknowledge you have received and reviewed the T-Mobile Terms and Conditions, and agree to be bound by them.... All disputes are subject to mandatory arbitration in accordance with paragraph 3 of the Terms and Conditions."
The introductory paragraph to the terms and conditions incorporated into the agreement states: "Welcome to T-Mobile. BY ACTIVATING OR USING OUR SERVICE YOU AGREE TO BE BOUND BY THE AGREEMENT. Please carefully read these Terms and Conditions ("T & C's") as they describe your Service and affect your legal rights. IF YOU DON'T AGREE WITH THESE T & C'S, DO NOT USE THIS SERVICE OR YOUR UNIT." Similarly, the handset shipping box was sealed across the closing seam with a sticker that stated: "IMPORTANT[¶] Read the enclosed T-Mobile Terms & Conditions. By using T-Mobile service, you agree to be bound by the Terms & Conditions, including the mandatory arbitration and early termination fee provisions." The terms and conditions were also included in a "Welcome Guide" enclosed in the boxes containing the handsets.
Section 3 of the terms and conditions incorporated into the agreement is entitled "Mandatory Arbitration; Dispute Resolution." It includes language waiving any right to seek classwide relief.[3] The terms *348 and conditions incorporated into each of the plaintiffs agreements included a mandatory arbitration clause including a class action waiver.

Early Termination Fees Case (A112082)
The action of plaintiffs Gatton, Hull, Nguyen, and Vaughan, brought on behalf of themselves individually and on behalf of all similarly situated California residents, challenges the fee imposed by T-Mobile for termination of the service agreement before its expiration date.
The complaint includes the following allegations. The service agreement between T-Mobile and its subscribers is typically one or two years in duration. Under the terms of the agreement, subscribers who terminate the service before the expiration of the agreement are subject to an early termination penalty of approximately $200 per telephone. The early termination penalties are also imposed if T-Mobile terminates the agreement for, among other reasons, nonpayment by the subscriber. The amount of the fee does not vary according to how long the contract has been in effect at the time of termination; it is the same whether the contract has been in effect for several weeks or several months. The flat-fee early termination penalty constitutes an unlawful penalty under Civil Code section 1671, subdivision (d),[4] is unlawful under the unfair competition law (Bus. & Prof.Code, § 17200 et seq.), and is unconscionable under the Consumers Legal *349 Remedies Act (CLRA) (Civ.Code, § 1750 et seq.).
Plaintiffs seek a permanent injunction prohibiting T-Mobile from collecting or enforcing the early termination penalty; a constructive trust on all monies collected as early termination penalties; and all other relief to which they are statutorily entitled, including restitution.

Handset Locking Case (A112084)
The action of plaintiffs Nguyen and Grant, brought on behalf of themselves individually and on behalf of all similarly situated California residents, challenges the practice of installing a locking device in T-Mobile handsets that prevents its subscribers from switching cell phone providers without purchasing a new handset.
The complaint includes the following allegations. The handsets T-Mobile sells its subscribers are manufactured by equipment vendors such as Nokia, Motorola, or Samsung. Each handset has a receptacle into which a machine readable SIM (subscriber information module) card can be inserted. The card is approximately the size of a postage stamp and contains the subscriber and the provider identifying information. The SIM card can be inserted and removed by hand; no special tools or equipment are required. T-Mobile employs a SIM lock to prevent its handsets from operating with a SIM card programmed for any other network. The SIM lock can be unlocked by entering an eight digit code number; once unlocked, the handset will operate with any compatible SIM card for any network. T-Mobile requires equipment vendors to alter the handsets they sell to T-Mobile by locking them with SIM locks and setting the SIM unlock code based on a secret algorithm provided by T-Mobile. The agreement between T-Mobile and its subscribers falsely states that T-Mobile handsets are not compatible with and will not work with other wireless networks. That misrepresentation constitutes unfair competition and violates the CLRA. The secret locking makes it impossible or impracticable for subscribers to switch cell phone service providers without purchasing a new handset.
Plaintiffs seek an order directing T-Mobile to disclose the existence and effect of the handset locks and to offer to unlock the handsets free of charge; an injunction prohibiting T-Mobile from secretly programming and selling handsets with SIM locks and from representing that the handsets are not compatible with services provided by other wireless carriers; and for restitution and/or disgorgement of all amounts wrongfully charged to plaintiffs and members of the class.

Motion to Compel Arbitration
T-Mobile moved to compel arbitration of the two actions in accord with the service agreement. Plaintiffs opposed the motion on the grounds that (1) their claims for injunctive relief under the Unfair Competition Law and the CLRA were not arbitrable, and (2) their remaining claims were not arbitrable because the arbitration clause was unconscionable.
The trial court denied the motion to compel. It concluded that the claims for injunctive relief were primarily for the benefit of the public and, consequently, were not subject to arbitration. As to the other claims, it concluded that the arbitration provision was unconscionable and therefore unenforceable. The trial court held that although the indications of procedural unconscionability were "not particularly strong," under Discover Bank v. Superior Court (2005) 36 Cal.4th 148, 30 Cal. Rptr.3d 76, 113 P.3d 1100 (Discover Bank), the arbitration clause was substantively unconscionable because its prohibition *350 on class arbitrations or participation in a class action was against public policy.

DISCUSSION
Appellant T-Mobile contends the trial court erred in denying its motion to compel because the class action waiver did not render the arbitration provision unconscionable and because principles of federal preemption require enforcement of the provision.

I. Unconscionability

An agreement to arbitrate is valid except when grounds exist for revocation of a contract. (Code Civ. Proc., §§ 1281, 1281.2, subd. (b).) Unconscionability is one ground on which a court may refuse to enforce a contract. (Civ.Code, § 1670.5.) The petitioner, T-Mobile here, bears the burden of proving the existence of a valid arbitration agreement and the opposing party, plaintiffs here, bears the burden of proving any fact necessary to its defense. (Engalla v. Permanente Medical Group, Inc. (1997) 15 Cal.4th 951, 972, 64 Cal. Rptr.2d 843, 938 P.2d 903.)
Whether a provision is unconscionable is a question of law. (Civ.Code, § 1670.5, subd. (a); Flores v. Transamerica HomeFirst, Inc. (2001) 93 Cal. App.4th 846, 851, 113 Cal.Rptr.2d 376 (Flores).) On appeal, when the extrinsic evidence is undisputed, as it is here, we review the contract de novo to determine unconscionability. (Stirlen v. Supercuts, Inc. (1997) 51 Cal.App.4th 1519, 1527, 60 Cal.Rptr.2d 138 (Stirlen); Flores, at p. 851, 113 Cal.Rptr.2d 376.)
The analytic framework employed by the California Supreme Court in determining whether a contract provision is unconscionable has its origins in A & M Produce Co. v. FMC Corp. (1982) 135 Cal. App.3d 473, 186 Cal.Rptr. 114 (A & M Produce). (See Armendariz v. Foundation Health Psychcare Services, Inc. (2000) 24 Cal.4th 83, 114, 99 Cal.Rptr.2d 745, 6 P.3d 669 (Armendariz).) Unconscionability has a procedural and a substantive element; the procedural element focuses on the existence of oppression or surprise and the substantive element focuses on overly harsh or one-sided results. (Armendariz, at p. 114, 99 Cal.Rptr.2d 745, 6 P.3d 669, quoting A & M Produce, at pp. 486-487, 186 Cal.Rptr. 114; see also Discover Bank, supra, 36 Cal.4th at p. 160, 30 Cal.Rptr.3d 76, 113 P.3d 1100.) To be unenforceable, a contract must be both procedurally and substantively unconscionable, but the elements need not be present in the same degree. (Armendariz, at p. 114, 99 Cal.Rptr.2d 745, 6 P.3d 669.) The analysis employs a sliding scale: "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." (Ibid.; see also Donovan v. RRL Corp. (2001) 26 Cal.4th 261, 291, 109 Cal.Rptr.2d 807, 27 P.3d 702.)

A. The Discover Bank Decision

Our analysis of the challenged arbitration provision is governed by the California Supreme Court decision Discover Bank. There, the court considered an unconscionability challenge to an arbitration provision prohibiting classwide arbitration in an agreement between a credit card company and its cardholders. (Discover Bank, supra, 36 Cal.4th at p. 152, 30 Cal. Rptr.3d 76, 113 P.3d 1100.) The provision was added to the agreement by a notice sent to cardholders. (Id. at p. 153, 30 Cal.Rptr.3d 76,113 P.3d 1100.)
The court emphasized the "important role of class action remedies in California law." (Discover Bank, supra, 36 Cal.4th at p. 157, 30 Cal.Rptr.3d 76, 113 P.3d *351 1100.) "`Frequently numerous consumers are exposed to the same dubious practice by the same seller so that proof of the prevalence of the practice as to one consumer would provide proof for all. Individual actions by each of the defrauded consumers is often impracticable because the amount of individual recovery would be insufficient to justify bringing a separate action; thus an unscrupulous seller retains the benefits of its wrongful conduct. A class action by consumers produces several salutary by-products, including a therapeutic effect upon those sellers who indulge in fraudulent practices, aid to legitimate business enterprises by curtailing illegitimate competition, and avoidance to the judicial process of the burden of multiple litigation involving identical claims. The benefit to the parties and the courts would, in many circumstances, be substantial.'" (Id. at p. 156, 30 Cal.Rptr.3d 76, 113 P.3d 1100, quoting Vasquez v. Superior Court (1971) 4 Cal.3d 800, 808, 94 Cal.Rptr. 796, 484 P.2d 964.)
In analyzing the unconscionability issue, Discover Bank first concluded that "when a consumer is given an amendment to its cardholder agreement in the form of a `bill stuffer' that he would be deemed to accept if he did not close his account, an element of procedural unconscionability is present." (Discover Bank, supra, 36 Cal.4th at p. 160, 30 Cal.Rptr.3d 76, 113 P.3d 1100.) Turning to the substantive element, the court stated "although adhesive contracts are generally enforced [citation], class action waivers found in such contracts may also be substantively unconscionable inasmuch as they may operate effectively as exculpatory contract clauses that are contrary to public policy. [Citation.] As stated in Civil Code section 1668: `All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law.' (Italics added.)" (Discover Bank, at p. 161, 30 Cal.Rptr.3d 76, 113 P.3d 1100.) The court acknowledged that class action and class arbitration waivers are not, in the abstract, exculpatory clauses, but because damages in consumer cases are often small and "because `"[a] company which wrongfully exacts a dollar from each of millions of customers will reap a handsome profit"' [citation], `"the class action is often the only effective way to halt and redress such exploitation."'" (Ibid.) Moreover, the court recognized that such class action and class arbitration waivers are "indisputably one-sided." (Ibid.) "`Although styled as a mutual prohibition on representative or class actions, it is difficult to envision the circumstances under which the provision might negatively impact Discover [Bank], because credit card companies typically do not sue their customers in class action lawsuits.'" (Ibid.)
In light of those considerations, Discover Bank held that when a waiver of classwide relief "is found in a consumer contract of adhesion in a setting in which disputes between the contracting parties predictably involve small amounts of damages, and when it is alleged that the party with the superior bargaining power has carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money, then, at least to the extent the obligation at issue is governed by California law, the waiver becomes in practice the exemption of the party `from responsibility for [its] own fraud, or willful injury to the person or property of another.' (Civ.Code, § 1668.) Under these circumstances, such waivers are unconscionable under California law and should not be enforced." (Discover Bank, supra, 36 Cal.4th at pp. 162-163, 30 Cal.Rptr.3d 76,113 P.3d 1100.)
*352 Against this legal backdrop, we consider the specific provision challenged here.

B. Procedural Unconscionability

The procedural element of the unconscionability analysis concerns the manner in which the contract was negotiated and the circumstances of the parties at that time. (Kinney v. United Health-Care Services, Inc. (1999) 70 Cal.App.4th 1322, 1329, 83 Cal.Rptr.2d 348, citing A & M Produce, supra, 135 Cal.App.3d at p. 486, 186 Cal.Rptr. 114.) The element focuses on oppression or surprise. (Armendariz, supra, 24 Cal.4th at p. 114, 99 Cal. Rptr.2d 745, 6 P.3d 669.) "Oppression arises from an inequality of bargaining power that results in no real negotiation and an absence of meaningful choice." (Flores, supra, 93 Cal.App.4th at p. 853, 113 Cal.Rptr.2d 376, citing A & M Produce, at p. 486, 186 Cal.Rptr. 114.)[5] Surprise is defined as "`the extent to which the supposedly agreed-upon terms of the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms.'" (Stirlen, supra, 51 Cal.App.4th at p. 1532, 60 Cal. Rptr.2d 138, quoting A & M Produce, at p. 486, 186 Cal.Rptr. 114.)
In their reply brief, plaintiffs did not dispute T-Mobile's assertion that the surprise aspect of procedural unconscionability is absent because the arbitration provision was fully disclosed to T-Mobile's customers. In response to our request for supplemental briefing, plaintiffs first urged that surprise is not necessary to find procedural unconscionability. Plaintiffs then asserted that we could find surprise because T-Mobile did not specifically bring to the attention of its customers that the arbitration provision included a class action waiver and because the print used in the agreement was small. We conclude that plaintiffs have not shown surprise. The arbitration provision was not disguised or hidden, and T-Mobile made affirmative efforts to bring the provision to the attention of its customers, including by referencing the provision on a sticker placed across the closing seam of the handset shipping box. (Stirlen, supra, 51 Cal. App.4th at p. 1532, 60 Cal.Rptr.2d 138.) A finding of procedural unconscionability in this case cannot be based on the existence of surprise.
The California Supreme Court has consistently reiterated that "`[t]he procedural element of an unconscionable contract generally takes the form of a contract of adhesion.'" (Discover Bank, supra, 36 Cal.4th at p. 160, 30 Cal.Rptr.3d 76, 113 P.3d 1100; see also Armendariz, supra, 24 Cal.4th at p. 113, 99 Cal.Rptr.2d 745, 6 P.3d 669 ["Unconscionability analysis begins with an inquiry into whether the contract is one of adhesion"]; Little v. Auto Stiegler, Inc. (2003) 29 Cal.4th 1064, 1071, 130 Cal. Rptr.2d 892, 63 P.3d 979.) Appellate courts considering unconscionability challenges in consumer cases have routinely found the procedural element satisfied where the agreement containing the challenged provision was a contract of adhesion. For example, in Flores we stated *353 that "[a] finding of a contract of adhesion is essentially a finding of procedural unconscionability" (Flores, supra, 93 Cal. App.4th at p. 853, 113 Cal.Rptr.2d 376), and in Aral v. EarthLink, Inc. (2005) 134 Cal.App.4th 544, 557, 36 Cal.Rptr.3d 229, the court described an adhesive contract as "quintessential procedural unconscionability." (See also Marin Storage & Trucking, Inc. v. Benco Contracting & Engineering, Inc. (2001) 89 Cal.App.4th 1042, 1054, 107 Cal.Rptr.2d 645 (Mann Storage); Cohen v. DirecTV, Inc. (2006) 142 Cal.App.4th 1442, 1451, 48 Cal.Rptr.3d 813.)
Whether the challenged provision is within a contract of adhesion pertains to the oppression aspect of procedural unconscionability. A contract of adhesion is "`"imposed and drafted by the party of superior bargaining strength"'" and "`"relegates to the subscribing party only the opportunity to adhere to the contract or reject it."'" (Discover Bank, supra, 36 Cal.4th at p. 160, 30 Cal.Rptr.3d 76, 113 P.3d 1100.) This definition closely parallels the description of the oppression aspect of procedural unconscionability, which "arises from an inequality of bargaining power that results in no real negotiation and an absence of meaningful choice." (Flores, supra, 93 Cal.App.4th at p. 853, 113 Cal.Rptr.2d 376, citing A & M Produce, supra, 135 Cal.App.3d at p. 486, 186 Cal.Rptr. 114; see also Perdue v. Crocker National Bank (1985) 38 Cal.3d 913, 925, fn. 9, 216 Cal.Rptr. 345, 702 P.2d 503 [noting that oppression arises from "unequal bargaining power"].) It is clear that the T-Mobile service agreement was a contract of adhesion: T-Mobile drafted the form agreement, its bargaining strength was far greater than that of individual customers, and customers were required to accept all terms and conditions of the agreement as presented or forgo T-Mobile's telephone service.
Nevertheless, T-Mobile argues that there was no oppression in the formation of the agreements because plaintiffs had the option of obtaining mobile phone service from one of two other providers whose agreements did not contain class action waivers. Preliminarily, we note that the evidence of the availability of market alternatives is exceedingly slim.[6] More fundamentally, we reject the contention that the existence of market choice altogether negates the oppression aspect of procedural unconscionability. "Procedural unconscionability focuses on the manner in which the disputed clause is presented to the party in the weaker bargaining position. When the weaker party is presented the clause and told to `take it or leave it' without the opportunity for meaningful negotiation, oppression, and therefore procedural unconscionability, are present." (Szetela v. Discover Bank (2002) 97 Cal.App.4th 1094, 1100, 118 Cal. Rptr.2d 862 (Szetela).) The existence of consumer choice decreases the extent of procedural unconscionability but does not negate the oppression and obligate courts to enforce the challenged provision regardless of the extent of substantive unfairness. *354 The existence of consumer choice is relevant, but it is not determinative of the entire issue. (Ibid.)[7]
We considered market alternatives as a relevant factor in our decision in Marin Storage, supra, 89 Cal.App.4th 1042, 107 Cal.Rptr.2d 645. There, a general contractor challenged the enforceability of an indemnification provision in a form subcontract created by a crane rental company. (Id., at pp. 1046-1048,107 Cal.Rptr.2d 645.) The procedural element was satisfied because the agreement at issue was "a contract of adhesion and, hence, procedurally unconscionable." (Id. at p. 1054, 107 Cal. Rptr.2d 645.) But the degree of procedural unconscionability was limited because the contractor was sophisticated and had choice in selecting crane providers; in fact the plaintiff had done business with ten other firms. (Id. at p. 1056, 107 Cal. Rptr.2d 645.) We also considered substantive unconscionability and concluded that, viewed in its commercial context, the indemnification provision was not overly one-sided or unreasonable. (Id. at pp. 1055-1056, 107 Cal.Rptr.2d 645.) Balancing the procedural and substantive elements, we concluded that "[i]n light of the low level of procedural unfairness ... a greater degree of substantive unfairness than has been shown here was required before the contract could be found substantively unconscionable." (Id. at p. 1056, 107 Cal. Rptr.2d 645; see also Woodside Homes of Cal., Inc. v. Superior Court (2003) 107 Cal.App.4th 723, 730, 132 Cal.Rptr.2d 35 [because plaintiff home buyers were not unsophisticated or lacking in choice, they established only a "low level" of procedural unconscionability and were obligated to establish "a high level of substantive unconscionability"].)
The Marin Storage approach is consistent with the instruction in Armendariz, supra, 24 Cal.4th at p. 114, 99 Cal.Rptr.2d 745, 6 P.3d 669, that the elements of procedural and substantive unconscionability "need not be present in the same degree." The court explained: "`Essentially a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves.' [Citations.] In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." (Ibid.)
In the three appellate decisions relied on by T-Mobile to support its approach to procedural unconscionability, the results would be the same under the Marin Storage reasoning. In two, the courts, like Marin Storage, actually rejected the unconscionability claims only after finding no clear substantive unfairness. (Morris v. Redwood Empire Bancorp, supra, 128 Cal. App.4th at p. 1322, 27 Cal.Rptr.3d 797 ["In sum, we are able to discern little or no procedural unconscionability from the allegations of the second amended complaint.... [¶] We now turn our analysis to substantive unconscionability"]; Wayne v. Staples, Inc., supra, 135 Cal.App.4th at p. 483, 37 Cal.Rptr.3d 544.) Critically, any substantive unconscionability was relatively *355 minor: Morris involved only a $150 fee charged upon termination of a credit card merchant account; Staples involved allegedly excessive charges for "declared value coverage" but the charges were "comparable to the amount charged by other retailers of shipping services." (Morris, at pp. 1323-1324, 27 Cal.Rptr.3d 797; Staples, at p. 483, 37 Cal.Rptr.3d 544.) In the third, Dean Witter Reynolds, Inc. v. Superior Court (1989) 211 Cal.App.3d 758, 772, 259 Cal.Rptr. 789 (Dean Witter), while the court did not reach the issue of substantive unconscionability, the challenged provision was a relatively insignificant $50 fee for terminating an individual retirement account.
The cases are distinguishable because in each there was not a high degree of substantive unconscionability that could justify a court "`disregarding] the regularity of the procedural process of the contract formation.'" (Armendariz, supra, 24 Cal.4th at p. 114, 99 Cal.Rptr.2d 745, 6 P.3d 669.) In other words, because any substantive unconscionability was low, the sliding scale analysis did not provide a basis to refuse to enforce the provisions in light of the minimal procedural unconscionability.
The rule T-Mobile asks us to adopt disregards the sliding scale balancing required by Armendariz; in the absence of evidence of surprise, the proposed rule would allow any evidence of consumer choice to trump all other considerations, mandating courts to enforce the challenged provisions without considering the degree of substantive unfairness and the potential harm to important public policies. Although contracts of adhesion are well accepted in the law and routinely enforced, the inherent inequality of bargaining power supports an approach to unconscionability that preserves the role of the courts in reviewing the substantive fairness of challenged provisions. (Graham v. Scissor-Tail, Inc., supra, 28 Cal.3d at pp. 817-818, 171 Cal.Rptr. 604, 623 P.2d 165; Marin Storage, supra, 89 Cal.App.4th at p. 1052, 107 Cal.Rptr.2d 645.) Otherwise, the imbalance of power creates an opportunity for overreaching in drafting form agreements. (See Graham v. Scissor-Tail, at pp. 817-818, 171 Cal.Rptr. 604, 623 P.2d 165.) The possibility of overreaching is even greater in ordinary consumer transactions involving relatively inexpensive goods or services because consumers have little incentive to carefully scrutinize the contract terms or to research whether there are adequate alternatives with different terms, and companies have every business incentive to craft the terms carefully and to their advantage. The unconscionability doctrine ensures that companies are not permitted to exploit this dynamic by imposing overly one-sided and onerous terms. (Ibid.) In sum, there are provisions so unfair or contrary to public policy that the law will not allow them to be imposed in a contract of adhesion, even if theoretically the consumer had an opportunity to discover and use an alternate provider for the good or service involved.
We reject the rule proposed by T-Mobile. Instead we hold that absent unusual circumstances,[8] use of a contract *356 of adhesion establishes a minimal degree of procedural unconscionability notwithstanding the availability of market alternatives. If the challenged provision does not have a high degree of substantive unconscionability, it should be enforced. But, under Armendariz, supra, 24 Cal.4th at p. 114, 99 Cal.Rptr.2d 745, 6 P.3d 669, we conclude that courts are not obligated to enforce highly unfair provisions that undermine important public policies simply because there is some degree of consumer choice in the market.
The Ninth Circuit, sitting en banc in Nagrampa v. MailCoups, Inc. (9th Cir. 2006) 469 F.3d 1257, reached the same conclusion. There, a franchisee contended that an arbitration provision in a contract of adhesion was unconscionable. (Id. at p. 1281.) The court rejected the franchisor's argument that the availability of other franchising opportunities could alone defeat the plaintiffs claim of procedural unconscionability. (Id. at p. 1283.) Because the franchisor had overwhelming bargaining power, drafted the contract, and presented it on a take-it-or-leave-it basis, there was "minimal" evidence of procedural unconscionability. (Id. at p. 1284.) The court reasoned that the minimal showing was "sufficient to require us, under California law, to reach the second prong of the unconscionability analysis. We therefore next examine the extent of substantive unconscionability to determine, whether based on the California courts' sliding scale approach, the arbitration provision is unconscionable." (Ibid.)
We conclude that plaintiffs showed a minimal degree of procedural unconscionability arising from the adhesive nature of the agreement. But this is "`the beginning and not the end of the analysis insofar as enforceability of its terms is concerned.'" (Graham v. Scissor-Tail, Inc., supra, 28 Cal.3d at p. 819, 171 Cal. Rptr. 604, 623 P.2d 165.)[9] Under the sliding scale approach, plaintiffs were obligated to make a strong showing of substantive unconscionability to render the arbitration provision unenforceable.

C. Substantive Unconscionability

The substantive element of the unconscionability analysis focuses on overly harsh or one-sided results. (Armendariz, supra, 24 Cal.4th at p. 114, 99 Cal. Rptr.2d 745, 6 P.3d 669; Flores, supra, 93 Cal.App.4th at p. 853, 113 Cal.Rptr.2d 376.) In light of Discover Bank, we conclude that the challenged provision has a high degree of substantive unconscionability.
In considering whether class action waivers may be unconscionable, Discover Bank emphasized that class actions are often the only effective way to halt corporate wrongdoing and that class action *357 waivers are "indisputably one-sided" because companies typically do not sue their customers in Class action lawsuits. (Discover Bank, supra, 36 Cal.4th at p. 161, 30 Cal.Rptr.3d 76, 113 P.3d 1100.) The court did not conclude that all class action waivers are necessarily unconscionable, but the court did hold that "when the waiver is found in a consumer contract of adhesion in a setting in which disputes between the contracting parties predictably involve small amounts of damages, and when it is alleged that the party with the superior bargaining power has carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money," then the waiver is exculpatory in effect and unconscionable under California law. (Discover Bank, supra, 36 Cal.4th at pp. 162-163, 30 Cal.Rptr.3d 76, 113 P.3d 1100; see also Cohen v. DirecTV, Inc., supra, 142 Cal.App.4th at pp. 1451-1454, 48 Cal.Rptr.3d 813; Klussman v. Cross Country Bank (2005) 134 Cal.App.4th 1283, 1297-1298, 36 Cal.Rptr.3d 728; Aral v. EarthLink, Inc., supra, 134 Cal.App.4th at pp. 555-557, 36 Cal.Rptr.3d 229; Szetela, supra, 97 Cal.App.4th at pp. 1100-1102, 118 Cal.Rptr.2d 862 [cited with approval in Discover Bank].)
T-Mobile contends that this case is distinguishable from Discover Bank on two grounds. First, the amount in controversy exceeds the $29 late payment fee involved in Discover Bank. The largest monetary damage claim is the $200 early termination fee. We agree with Cohen v. DirecTV, Inc., supra, 142 Cal.App.4th at p. 1452, 48 Cal.Rptr.3d 813, which rejected the same argument T-Mobile makes. The court reasoned: "While $1,000 is not an insignificant sum, many consumers of services such as those offered by DIRECTV may not view that amount as sufficient `"`"to warrant individual litigation,"'"' and certainly it is not sufficient to obtain legal assistance in prosecuting the claim. [Discover Bank, supra, 36 Cal.4th at p. 157, 30 Cal.Rptr.3d 76, 113 P.3d 1100.] In short, the class action device remains, in our view, the only practicable way for consumers of services such as DIRECTVs to deter and redress wrongdoing of the type Cohen alleges. Damages that may or may not exceed $1,000 do not take DIRECTV's class action waiver outside `a setting in which disputes between the contracting parties predictably involve small amounts of damages....'" (Cohen, at p. 1452, 48 Cal.Rptr.3d 813.) The same is true in this case.
Second, T-Mobile contends that the class action waiver would not exculpate the company from any wrongdoing because, unlike in Discover Bank, plaintiffs assert inarbitrable claims for public injunctive relief. However, under Discover Bank's reasoning, the class action waiver would at the very least effectively exculpate T-Mobile from the alleged fraud perpetrated on the class members, which is enough to bring this case within the scope of the Discover Bank holding. Moreover, Discover Bank rejected the argument that private lawsuits seeking injunctive relief and attorney fees awards are an adequate substitute for class actions. The court specifically stated that it was not persuaded that the problems posed by class action waivers are ameliorated by the availability of attorney fees awards in private litigation or the availability of public actions (brought by the Attorney General or other designated law enforcement officials) for injunctive relief and civil penalties. (Discover Bank, supra, 36 Cal.4th at p. 162, 30 Cal.Rptr.3d 76, 113 P.3d 1100; see also id. at p. 180, 30 Cal.Rptr.3d 76, 113 P.3d 1100 (dis. opn. of Baxter, J.).)
In the consumer context, class actions and arbitrations are "often inextricably linked to the vindication of substantive rights." (Discover Bank, supra, 36 *358 Cal.4th at p. 161, 30 Cal.Rptr.3d 76, 113 P.3d 1100.) There is nothing extraordinary about the circumstances of this case that distinguishes it from the typical consumer class actions described in Discover Bank. Because it is directly within the scope of the holding in that case, we conclude that the class action waiver has a high degree of substantive unconscionability. Applying the sliding scale test for unconscionability, even though the evidence of procedural unconscionability is limited, the evidence of substantive unconscionability is strong enough to tip the scale and render the arbitration provision unconscionable. The trial court properly denied the motion to compel arbitration.[10]
II.[**]

DISPOSITION
The order denying the motion to compel arbitration is affirmed. Costs are awarded to plaintiffs.
I concur: SIMONS, J.
JONES, P.J., Concurring and Dissenting.
Under compulsion of Discover Bank v. Superior Court (2005) 36 Cal.4th 148, 30 Cal.Rptr.3d 76, 113 P.3d 1100 (Discover Bank), I concur in my colleagues' conclusion that the arbitration clauses before us are substantively unconscionable because of the prohibition in the mandatory arbitration provision against the pursuit of any remedy by a plaintiff as a representative of other potential claimants or class of claimants. But I cannot agree that the contracts are also procedurally unconscionable. In my view, plaintiffs do not show, on the record before us, either surprise or oppression to support their procedural unconscionability claim. In the absence of both procedural and substantive elements of unconscionability, this court should decline to exercise its discretion to refuse to enforce the disputed clause. (Armendariz v. Foundation Health Psychcare Services, Inc. (2000) 24 Cal.4th 83, 114, 99 Cal. Rptr.2d 745, 6 P.3d 669 (Armendariz).) The trial court erred when it denied the motion to compel arbitration, and its order so holding should be reversed.

BACKGROUND
It is undisputed that the challenged terms of the cellular telephone service agreement were drafted by cellular telephone provider T-Mobile and executed by each plaintiff when he/she signed up for Mobile cellular telephone service. The contracts were presented on a "take-it-or-leave-it" basis, were not subject to negotiation, and were therefore adhesive contracts. As recounted by the majority, a short paragraph directly above the signature line contained a statement that the customer's signature constituted the customer's acknowledgement of receipt, review of, and agreement to be bound by "the T-Mobile Terms and Conditions," and that "All disputes are subject to mandatory arbitration in accordance with paragraph 3 of the Terms and Conditions." A *359 second notice appeared in the introductory paragraph, cautioning subscribers in capitalized letters that "BY ACTIVATION OR USING OUR SERVICE YOU AGREE TO BE BOUND BY THE AGREEMENT ... IF YOU DON'T AGREE WITH THESE T & C'S, DON'T USE THIS SERVICE OR YOUR UNIT."
Customers were given a third notice on the closing seam of the shipping box containing the newly purchased handset. The box was sealed with a sticker that stated: "IMPORTANT Read the enclosed T-Mobile Terms & Conditions. By using Mobile service, you agree to be bound by the Terms & Conditions, including the mandatory arbitration and early termination fee provisions."
Once the shipping box was opened, the subscriber found a "Welcome Guide." Page three of the "Welcome Guide" was a table of contents, which listed "Terms and Conditions" as one of the sections of the guide. At the bottom of the table of contents was the statement: "Important Note: By using T-Mobile service, you acknowledge that you have read and agree to the terms and conditions of the Service Agreement." The "Terms and Conditions" included in the welcome guide was identical to the terms and conditions given to the customers before they signed their service agreements, including the same introductory paragraph admonishing the customer to read the terms and conditions carefully and not to use the service if they did not agree with all terms and conditions.
Section 5 of the terms and conditions, entitled "Cancellation and Return Policy," describes a "Return Period." It states, "[t]here is a Return Period during which you can cancel a newly activated line of Service without paying a cancellation fee. The Return Period is 14 calendar days from the date of Service activation or 30 days from the Phone's purchase date if you have not activated service.... You may be required to pay a restocking fee...."
The actions brought by plaintiffs Gatton, Hull, Nguyen and Vaughan, on behalf of themselves individually and on behalf of all similarly situated California residents, challenged the term in T-Mobile's service agreement which imposed a fee for termination of the service agreement before its expiration date. The action of plaintiffs Nguyen and Grant, brought on behalf of themselves individually and on behalf of all similarly situated California residents, concerns a locking device installed in T-Mobile handsets that prevents its subscribers from switching cell phone providers without purchasing a new handset.

DISCUSSION
It is well settled that an agreement to arbitrate is valid, irrevocable, and enforceable except when grounds exist for the revocation of any contract (Code Civ. Proc., §§ 1281, 1281.2, subd. (b)), and it is equally settled that a court can refuse to enforce an unconscionable provision in a contract. (Civ.Code, § 1670.5; Armendariz, supra, 24 Cal.4th at pp. 83, 114, 99 Cal.Rptr.2d 745, 6 P.3d 669.)

1. Unconscionability

In Discover Bank our Supreme Court "`briefly recapitulate[d] the principles of unconscionability'" in the context of a challenge to a mandatory arbitration clause forbidding classwide arbitration that was added to the plaintiffs bank credit card agreement 13 years after the plaintiff obtained the card. The bank informed the plaintiff that continued use of the card would be deemed acceptance of the new terms unless the cardholder notified the bank that he did not want to accept the new terms and ceased using his account. (Discover Bank, supra, 36 Cal.4th at pp. *360 154, 160, 30 Cal.Rptr.3d 76, 113 P.3d 1100.) "[T]he doctrine has `"both a "procedural" and a "substantive" element,' the former focusing on `"oppression"' or `"surprise"' due to unequal bargaining power, the latter on `"overly harsh"' "or" `"one-sided"' results." [Citation.] The procedural element of an unconscionable contract generally takes the form of a contract of adhesion, `"which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contact or reject it.' [¶] Substantively unconscionable terms may take various forms, but may generally be described as unfairly one-sided.' (Little v. Auto Stiegler, Inc. (2003) 29 Cal.4th 1064, 1071, 130 Cal.Rptr.2d 892, 63 P.3d 979 (Little)." (Discover Bank, supra, 36 Cal.4th at p. 160, 30 Cal.Rptr.3d 76, 113 P.3d 1100.))[1]
Discover Bank continued: "We agree that at least some class action waivers in consumer contracts are unconscionable under California law. First, when a consumer is given an amendment to its cardholder agreement in the form of a `bill stuffer' that he would be deemed to accept if he did not close his account, an element of procedural unconscionability is present, [quoting Szetela v. Discover Bank (2002) 97 Cal.App.4th 1094, 1100, 118 Cal.Rptr.2d 862 (Szetela).] Moreover, although adhesive contracts are generally enforced [quoting Scissor-Tail], class action waivers found in such contracts may also be substantively unconscionable inasmuch as they may operate effectively as exculpatory contract clauses that are contrary to public policy." (Discover Bank, supra, 36 Cal.4th at pp. 160-161, 30 Cal.Rptr.3d 76, 113 P.3d 1100.)
For a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability, both procedural and substantive unconscionability must be present, although not necessarily in the same degree. (Armendariz, supra, 24 Cal.4th at p. 114, 99 Cal.Rptr.2d 745, 6 P.3d 669; see also A & M Produce Co. v. FMC Corp. (1982) 135 Cal.App.3d 473, 487, 493, 186 Cal.Rptr. 114 (A & M Produce).) T-Mobile contends the service agreement at issue here is not procedurally unconscionable because there was no showing of surprise or oppression.[2] I agree.

2. Procedural Unconscionability

A. Surprise
T-Mobile argues that plaintiffs cannot claim surprise regarding the service agreement's arbitration provision because the provision was fully disclosed to potential *361 purchasers. As the majority notes, plaintiffs conceded in their reply brief the absence of the surprise component of procedural unconscionability. Plaintiffs' efforts to resurrect this argument in supplemental briefing must fail. The record contains ample evidence of T-Mobile's disclosures and admonitions given to subscribers before and after the purchase. The quantity and prominence of the disclosures and the grace period of 14 days from service activation or 30 days from purchase if no activation, should a customer decide he or she did not want to accept the terms of the service agreement, demonstrate the absence of surprise to support procedural unconscionability. I turn then to the issue of oppression.

B. Oppression
T-Mobile argues the oppression element of procedural unconscionability is lacking because plaintiffs could obtain mobile phone service from "other providers whose agreements did not contain a mandatory arbitration provision and because there are no other indicia of oppression. Plaintiffs counter that the service agreement "provides a maximum degree of procedural unconscionability" because it is a standard form, preprinted, nonnegotiable contract of adhesion presented to them on a "take it or leave it" basis.
The oppression component of procedural unconscionability has long been described as arising from an inequality of bargaining power of the parties to the contract which results in no real negotiation and an absence of meaningful choice on the part of the weaker party. (A & M Produce, supra, 135 Cal.App.3d at p. 486, 186 Cal. Rptr. 114; see also Wayne v. Staples, Inc. (2006) 135 Cal.App.4th 466, 480, 37 Cal. Rptr.3d 544; Crippen v. Central Valley RV Outlet (2004) 124 Cal.App.4th 1159, 1164, 22 Cal.Rptr.3d 189; Kinney v. United HealthCare Services, Inc. (1999) 70 Cal. App.4th 1322, 1329, 83 Cal.Rptr.2d 348.)
The majority ascribes to the California Supreme Court a consistent position that "`[t]he procedural element of an unconscionable contract generally takes the form of a contract of adhesion.'" [at p. 352.] (Discover Bank, supra, 36 Cal.4th at p. 160, 30 Cal.Rptr.3d 76, 113 P.3d 1100, quoting Little, supra, 29 Cal.4th at p. 1071, 130 Cal.Rptr.2d 892, 63 P.3d 979; see also Armendariz, supra, 24 Cal.4th at p. 113, 99 Cal.Rptr.2d 745, 6 P.3d 669.) While our Supreme Court has repeated the quoted statement, I cannot agree that our high court views procedural unconscionability as established based only on the presence of "unequal bargaining power" (see Perdue v. Crocker National Bank (1985) 38 Cal.3d 913, 925, fn. 9, 216 Cal.Rptr. 345, 702 P.2d 503) or "an inequality of bargaining power that results in no real negotiation and an absence of meaningful choice" (Flores v. Transamerica HomeFirst, Inc. (2001) 93 Cal.App.4th 846, 853, 113 Cal.Rptr.2d 376 (Flores), quoting A & M Produce, supra, 135 Cal.App.3d at p. 486, 186 Cal.Rptr. 114). A review of the origin of these definitional statements leads me to conclude that more than the existence of an adhesive contract is required.
Critical to an unconscionability analysis is Scissor-Tail, supra, 28 Cal.3d 807, 171 Cal.Rptr. 604, 623 P.2d 165, in which the plaintiff contended he should not be compelled to arbitrate a dispute because the underlying agreement, at least to the extent it required arbitration of disputes between the parties, was "an unenforceable contract of adhesion." (Id. at p. 817, 171 Cal.Rptr. 604, 623 P.2d 165.) Scissor-Tail concluded the agreement was adhesive, i.e., a "`standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere *362 to the contract or reject it.'" (Ibid., quoting Neal, supra, 188 Cal.App.2d at p. 694, 10 Cal.Rptr. 781.) But Scissor-Tail continued: "To describe a contract as adhesive in character is not to indicate its legal effect. It is, rather, `the beginning and not the end of the analysis insofar as enforceability of its terms is concerned.' [Citation.] Thus, a contract of adhesion is fully enforceable according to its terms [citations] unless certain other factors are present which, under established legal rules  legislative or judicial  operate to render it otherwise." (Scissor-Tail, supra, at p. 819, 171 Cal.Rptr. 604, 623 P.2d 165, fns. omitted) No subsequent case has disapproved this language. Indeed, although Discover Bank recited the A & M Produce analytic framework, Discover Bank also observed that contracts of adhesion are generally enforced, specifically quoting Scissor-Tail. (Discover Bank, supra, 36 Cal.4th at pp. 160, 161, 30 Cal. Rptr.3d 76, 113 P.3d 1100.)
Reading Scissor-Tail together with A & M Produce, and particularly the phrase in the latter decision  "an absence of meaningful choice on the part of the weaker party" , I conclude there is no taint of unconscionability from the bare fact that a contract is adhesive. Other factors must be present to preclude enforceability on grounds of unconscionability.
I recognize that a number of cases have implied, if not stated outright, that a contract of adhesion is inherently procedurally unconscionable. (See, e.g., Flores, supra, 93 Cal.App.4th at pp. 853-854, 113 Cal. Rptr.2d 376; Marin Storage & Trucking, Inc. v. Benco Contracting & Engineering, Inc. (2001) 89 Cal.App.4th 1042, 1053, 107 Cal.Rptr.2d 645 (Marin Storage); Kinney v. United HealthCare, supra, 70 Cal. App.4th at p. 1329, 83 Cal.Rptr.2d 348 (Kinney); Martinez v. Master Protection Corp. (2004) 118 Cal.App.4th 107, 114, 12 Cal.Rptr.3d 663 (Martinez).) "Analysis of unconscionability begins with an inquiry into whether the contract was a contract of adhesion  i.e., a standardized contract, imposed upon the subscribing party without an opportunity to negotiate the terms. [Citations.] A finding of a contract of adhesion is essentially a finding of procedural unconscionability. [Citations.]" (Flores, supra, 93 Cal.App.4th at p. 853, 113 Cal.Rptr.2d 376.) However, a review of the nature and/or timing of the offer, of the disputed contract provisions to plaintiffs in these cases generally shows the presence of facts supporting procedural unconscionability beyond the bare existence of a contract of adhesion.
Flores, for example, concerned a "Loan Agreement and Note" and deed of trust for a reverse mortgage with a mandatory arbitration clause, which did not appear until page 11, section 20 of the 14-page agreement. (Flores, supra, 93 Cal.App.4th at p. 849, 113 Cal.Rptr.2d 376.) Moreover, the "IMPORTANT INFORMATION FOR ALL BORROWERS" given to the 80- and 76-year-old plaintiffs indicated they were required to sign the standardized loan documents in order to establish the reverse mortgage; the plaintiffs were never told the loan documents were negotiable; and the mortgage company representative told them that the company was the only one in California that offered reverse mortgages, thereby indicating they had no real choice of alternate lenders. (Id. at pp. 851, 853, 113 Cal.Rptr.2d 376.) Not only was the arbitration agreement presented on a "take it or leave it basis," but the borrowers were affirmatively told they had no real alternative.
Marin Storage involved an indemnification clause that appeared on the reverse side of a document that described itself as a "Work Authorization and Contract," but which was more obviously an invoice for *363 work performed than a contract. (Marin Storage, supra, 89 Cal.App.4th at p. 1047, 107 Cal.Rptr.2d 645.) The reverse side was difficult to read and was presented for signature at the job site with no reasonable opportunity to read or consider the terms, and, according to the evidence, the document was treated by the plaintiff corporation as an invoice, not a contract purporting to modify the critical allocation of risks and liability for damages. (Id., at pp. 1053, 1054, 107 Cal.Rptr.2d 645.) While we found "no error in the trial court's conclusion that the [contract] was a contract of adhesion and, hence, procedurally unconscionable," the evidence concerning the appearance and presentation of the contract readily comported with the "unfair surprise" element of procedural unconscionability, i.e., supposedly agreed-upon terms that are hidden in a prolix printed form and never brought to the attention of the weaker party. (See A & M Produce, supra, 135 Cal.App.3d at pp. 486, 488, 490, 186 Cal.Rptr. 114.)
Kinney, supra, 70 Cal.App.4th 1322, 83 Cal.Rptr.2d 348 involved a mandatory arbitration policy contained in an employee handbook issued by an employer health care services corporation. The employer required an employee with six years service to sign an acknowledgment of receipt of the handbook when she returned to work after a hospitalization. (Id. at pp. 1324-1326, 83 Cal.Rptr.2d 348.) The employee was pressured to sign the form acknowledging receipt of the handbook the same day she received it, precluding her from reviewing the handbook or its arbitration clause. Significantly, the language used in the policy to describe its scope was so extensive as to make it difficult for a layperson to read and understand its parameters. "... [A]fter a statement of intent extolling the virtues of ... the arbitration process, the policy provides, in a fairly lengthy paragraph, that United is not required to pursue any claim of its own in an arbitration setting." (Id. at p. 1330, 83 Cal.Rptr.2d 348.) Moreover, while the policy was unilaterally imposed on employees, the corporation could modify it at any time without notice. (Ibid.)
In Martinez, supra, 118 Cal.App.4th 107, 12 Cal.Rptr.3d 663 prospective employee Martinez indicated to the human resources representative that he preferred not to sign an arbitration agreement. He was told he could not work for the employer if he did not sign and accept it. In finding the arbitration clause procedurally unconscionable, the court cited not only the inequality of bargaining power, but also the absence of meaningful choice. (Id. at p. 114,12 Cal.Rptr.3d 663.)
The factual circumstances in which the Flores, Kinney and Martinez contracts were made provide additional grounds to support a finding of oppression apart from the bare fact that the contracts at issue were contracts of adhesion, as that term is defined in Scissor-Tail and Neal. (See fn. 1, ante.)
As I have noted, numerous appellate courts have defined the "oppression" component of procedural unconscionability more broadly than simply the presentation of an adhesive contract on a "take it or leave it" basis. "... [O]ur state's highest court recognized the point at which an adhesion contract becomes oppressive: `In many cases of adhesion contracts, the weaker party lacks not only the opportunity to bargain but also any realistic opportunity to look elsewhere for a more favorable contract; he must either adhere to the standardized agreement or forego the needed service.'" (Morris v. Redwood Empire Bancorp (2005) 128 Cal.App.4th 1305, 1320, 27 Cal.Rptr.3d 797, italics in original, quoting Madden v. Kaiser Foundation Hospitals (1976) 17 Cal.3d 699, 711, *364 131 Cal.Rptr. 882, 552 P.2d 1178 (Madden).)[3]
Dean Witter Reynolds, Inc. v. Superior Court (1989) 211 Cal.App.3d 758, 259 Cal.Rptr. 789 (Dean Witter), for example, considered at length the availability of alternative sources of financial services in deciding whether "oppression" and unconscionability had been established to support an experienced investor's challenge under the Consumer Legal Remedies Act (CLRA; Civ.Code, § 1750, et seq.) to the contract governing his individual retirement account. The court rejected the investor's contention that availability of alternate sources is irrelevant to the adhesion analysis. "... [E]ven though a contract may be adhesive, the existence of "`meaningful'" alternatives ... in the form of other sources of supply tends to defeat any claim of unconscionability as to the contract in issue." (Dean Witter, supra, 211 Cal.App.3d at p. 771, 259 Cal.Rptr. 789.) While the investor's experience and sophistication were factually significant, the court held, "[The investor] was not shown to lack a meaningful choice with respect to the termination fee, and hence the `oppression' factor of the procedural element of unconscionability was not established." (Id. at p. 772, 259 Cal.Rptr. 789.)
In the case before us, these precedents inform my assessment of whether and to what extent the availability of alternative sources for the goods or service offered in an indisputably adhesive contract will avoid a finding that a challenged arbitration provision is procedurally unconscionable. No case has been cited to us which considered this precise issue. Only Szetela, supra, 97 Cal.App.4th at page 1100, 118 Cal.Rptr.2d 862 appears to have considered the question in the context of determining the enforceability of an arbitration clause in a contract for consumer goods or services.[4]
Szetela is factually similar to Discover Bank. A long-time bank cardholder received, in the form of a "bill stuffer," an amendment to his cardholder agreement that provided for mandatory arbitration and prohibited class arbitration. His choices were to accept the amendment or to close his account. Szetela specifically rejected the contention that the availability of a meaningful opportunity to obtain the offered goods or services elsewhere without the offending contract term "is the relevant test for unconscionability." (Szetela, supra, 97 Cal.App.4th at p. 1100, 118 Cal.Rptr.2d 862.) "[W]hether Szetela could have found another credit card issuer who would not have required his acceptance of a similar clause is not the deciding factor." (Id. at p. 1100, 118 Cal. *365 Rptr.2d 862.) The court observed that procedural unconscionability focuses "on the manner in which the disputed clause is presented to the party in the weaker bargaining position. When the weaker party is presented the clause and told to `take it or leave it' without the opportunity for meaningful negotiation, oppression, and therefore procedural unconscionability, are present. [Citation.] These are precisely the facts in the case before us. [Plaintiff] received the amendment to the Cardholder Agreement in a bill stuffer, and under the language of the amendment, he was told to 'take it or leave it.' His only option, if he did not wish to accept the amendment, was to close his account. We agree with [plaintiff] that the oppressive nature in which the amendment was imposed establishes the necessary element of procedural unconscionability." (Ibid.)
Read in its factual context, Szetela does not purport to dispense entirely with consideration of "absence of meaningful choice" in a procedural unconscionability analysis. Unlike the circumstances of the instant case, Szetela was conducting a procedural unconscionability analysis of a new adhesive condition imposed on an existing consumer agreement.
While the existence of a contract of adhesion is frequently the starting point for a procedural unconscionability analysis, adhesiveness and procedural unconscionability are discrete concepts. In my view, a contract of adhesion is not per se procedurally unconscionable. Even assuming the parties to the agreement do not have equal bargaining power, a realistic opportunity for the weaker party to avail him or herself of meaningful market alternatives can obviate oppression for purposes of procedural unconscionability. (Wayne v. Staples, Inc. (2006) 135 Cal.App.4th 466, 482, 37 Cal.Rptr.3d 544; Morris v. Redwood Empire Bancorp, supra, 128 Cal.App.4th at p. 1320, 27 Cal.Rptr.3d 797.) I do not disagree with Szetela that the availability of alternate sources of a product or service without binding the consumer to the objectionable class action waiver is not the "determinative" factor. (Szetela, supra, 97 Cal.App.4th at p. 1100, 118 Cal.Rptr.2d 862.) But it is a relevant factor. Indeed, the greater the number of alternatives available to the consumer, the more bargaining power is shifted to the consumer. I do not suggest that the existence of marketplace choice altogether negates the oppression aspect of procedural unconscionability. The extent and significance of meaningful alternatives must be assessed in the light of the particular circumstances of each transaction. Analyzed in this light, I conclude the service agreement herein has not been shown to be procedurally unconscionable.
As T-Mobile argues, and plaintiffs do not dispute, when plaintiffs entered into their service agreements with T-Mobile, two other nationwide wireless telephone companies, Nextel and Sprint, had service agreements that did not contain a class action waiver provision, and, in the case of Nextel, no arbitration agreement at all.[5]
*366 Furthermore, this agreement was presented to the customer at the time of the initial purchase, and, even after the purchase, the customer had a 14-day return period from date of activation, or a 30-day return period from date of purchase if not activated. These facts distinguish it from Szetela and Discover Bank, in which the bank sent their existing bankcard customers a mandatory arbitration/class action waiver provision as a "bill stuffer" addendum to their existing service agreements and forced the customers either to accept the new terms or to cancel their established accounts. While the T-Mobile customers may not have been able to negotiate the arbitration/class action waiver provision in the service agreement as part of their purchase negotiation, they were not confronted with a post-purchase choice of either accepting a more restrictive clause to an extant agreement, or foregoing entirely the service they had originally agreed to and enjoyed.
As Armendariz, supra, 24 Cal.4th 83, 99 Cal.Rptr.2d 745, 6 P.3d 669 and other decisions make plain, adhesive contracts of employment present very different policy considerations from the adhesive consumer contract for a service such as a cell phone. Employment contracts that contain mandatory arbitration clauses are especially susceptible to being oppressive because "in the case of preemployment arbitration contracts, the economic pressure exerted by employers on all but the most sought-after employees may be particularly acute, for the arbitration agreement stands between the employee and necessary employment, and few employees are in a position to refuse a job because of an arbitration requirement." (Id. at p. 115, 99 Cal.Rptr.2d 745, 6 P.3d 669; see also Little, supra, 29 Cal.4th at p. 1071, 130 Cal.Rptr.2d 892, 63 P.3d 979; Independent Assn. of Mailbox Center Owners, Inc. v. Superior Court (2005) 133 Cal.App.4th 396, 410, 34 Cal. Rptr.3d 659: franchise agreements akin to employment contracts because franchisees' livelihoods are involved; Fitz v. NCR Corp. (2004) 118 Cal.App.4th 702, 722, 13 Cal.Rptr.3d 88 (Fitz).)
Nothing like the economic pressure of obtaining or retaining employment is present in this case. However useful, convenient, or necessary cell phones may be, they are qualitatively different from the offer of a job, or the offer of continued employment (see Fitz, supra, 118 Cal. App.4th at p. 722, 13 Cal.Rptr.3d 88), or the imposition of a more restrictive policy to an existing employment (see Kinney v. United HealthCare Services, Inc., supra, 70 Cal.App.4th 1322, 83 Cal.Rptr.2d 348) or after one has accepted employment (Stirlen v. Supercuts, Inc. (1997) 51 Cal. App.4th 1519, 1534, 60 Cal.Rptr.2d 138), for which the job seeker or employee has no realistic alternative. An employee who has no opportunity to negotiate an employer's mandatory arbitration clause in the employment contract is limited to agreeing to the clause or forfeiting a paycheck and livelihood, and often crucial attendant benefits such as health care insurance or an employer sponsored pension program. Here, the contract at issue concerned a non-unique consumer good  mobile phone service  available new and used from several sources. There was no evidence that plaintiffs were unaware of the existence of other cell phone providers or that the services of the other providers were not available to them.
Notwithstanding the imbalance in the bargaining power between T-Mobile and its cell phone subscribers, plaintiffs have not persuaded me there is procedural unconscionability in the making of the service agreement. Plaintiffs were fully apprised of the terms of the service agreement, and they did not present evidence of lack of meaningful alternative sources or other arrangements *367 to meet their cellular telephone needs. In these circumstances, Mobile's conduct cannot be deemed oppressive.
As I stated at the outset, the Armendariz analytic framework requires both procedural and substantive elements before a court can exercise its discretion to refuse to enforce a contract under the unconscionability doctrine. (Armendariz, supra, 24 Cal.4th at p. 114, 99 Cal.Rptr.2d 745, 6 P.3d 669; see also A & M Produce, supra, 135 Cal.App.3d at p. 487, 186 Cal.Rptr. 114.) Because there is an absence on this record of both the surprise and oppression factors of procedural unconscionability, the service agreement is not unconscionable, and T-Mobile's motion to compel arbitration should be granted.
NOTES
[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of part II.
[1] The two cases from which these appeals arise are among the cases ordered consolidated in the Alameda County "Cellphone Termination Fee Cases," JCCP No. 4332. All cases concern unfair business practices actions against the seven major cell phone providers in California. For purposes of case management, the trial court divided the coordinated proceedings into three substantive topics: early termination, handset policies, and deposits.
[2] The service agreements and terms and conditions applicable to the plaintiffs are not identical, but the differences are not material to the issues on appeal. Throughout this decision we will use the documents applicable to plaintiff Adrienne Grant as exemplars.
[3] Section 3 of the arbitration agreement provides:

"YOU WILL FIRST NEGOTIATE WITH [MOBILE] IN GOOD FAITH TO SETTLE ANY CLAIM OR DISPUTE BETWEEN YOU AND U.S. IN ANY WAY RELATED TO OR CONCERNING THE AGREEMENT, OR OUR PROVISION TO YOU OF GOODS, SERVICES OR UNITS ("CLAIM"). YOU MUST SEND A WRITTEN DESCRIPTION OF YOUR CLAIM TO OUR REGISTERED AGENT. [] IF YOU DO NOT REACH AGREEMENT WITH U.S. WITHIN 30 DAYS, INSTEAD OF SUING IN COURT, YOU AGREE THAT ANY CLAIM MUST BE SUBMITTED TO FINAL, BINDING ARBITRATION WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA") UNDER ITS PUBLISHED WIRELESS INDUSTRY ARBITRATION RULES, WHICH ARE A PART OF THE AGREEMENT BY THIS REFERENCE AND ARE AVAILABLE BY CALLING THE AAA AT [listed telephone number] OR VISITING ITS WEB SITE AT [listed].... You will pay your share of the arbitrator's fees except (a) for claims less than $25, we will pay all arbitrator's fees and (b) for claims between $25 and $1000, you will pay $25 for the arbitrator's fee. You and we agree to pay our own other fees, costs and expenses including....
"Neither you nor we may be a representative of other potential claimants or a class of potential claimants in any dispute, nor may two or more individuals' disputes be consolidated or otherwise determined in one proceeding. While the prohibition on consolidated or classwide proceedings in this Sec. 3 will continue to apply: (a) you may take claims to small claims court, if they qualify for hearing by such court and (b) if you fail to timely pay amounts due, we may assign your account for collection and the collection agency may pursue such claims in court limited strictly to the collection of the past due debt and any interest or cost of collection permitted by law or the Agreement. YOU AND WE ACKNOWLEDGE AND AGREE THAT THIS SEC. 3 WAIVES ANY RIGHT TO A JURY TRIAL OR PARTICIPATION AS A PLAINTIFF OR AS A CLASS MEMBER IN A CLASS ACTION. IF A COURT OR ARBITRATOR DETERMINES THAT YOUR WAIVER OF YOUR ABILITY TO PURSUE CLASS OR REPRESENTATIVE CLAIMS IS UNENFORCEABLE, THE ARBITRATION AGREEMENT WILL NOT APPLY AND OUR DISPUTE WILL BE RESOLVED BY A COURT OF APPROPRIATE JURISDICTION, OTHER THAN A SMALL CLAIMS COURT. SHOULD ANY OTHER PROVISION OF THIS ARBITRATION AGREEMENT BE DEEMED UNENFORCEABLE, THAT PROVISION SHALL BE REMOVED, AND THE AGREEMENT SHALL OTHERWISE REMAIN BINDING."
[4] Civil Code section 1671, subdivision (d) provides: "[A] provision in a contract liquidating damages for the breach of the contract is void except that the parties to such a contract may agree therein upon an amount which shall be presumed to be the amount of damage sustained by a breach thereof, when, from the state of the case, it would be impracticable or extremely difficult to fix the actual damage."
[5] Oppression in the manner of formation of the contract is distinguished from substantive oppressiveness of the challenged provision. (See Armendariz, supra, 24 Cal.4th at p. 114, 99 Cal.Rptr.2d 745, 6 P.3d 669 [referring to the "oppression" aspect of procedural unconscionability and also whether the challenged term is "substantively oppressive"]; Graham v. Scissor-Tail, Inc. (1981) 28 Cal.3d 807, 820, 171 Cal.Rptr. 604, 623 P.2d 165 [considering whether a contract provision is unduly oppressive in substance].) Even if the manner of formation of a contract involves oppression and thereby satisfies the procedural unconscionability element, the challenged provision is unenforceable only if it is unduly unfair or oppressive in substance.
[6] The same day plaintiffs filed the fourth amended complaint against T-Mobile in the coordinated Cellphone Termination Fee Cases, plaintiffs' counsel filed nearly identical third consolidated amended complaints against Nextel and Sprint. The Nextel and Sprint service agreements were attached to the respective complaints; these service agreements do not include arbitration provisions with class action waivers. T-Mobile's argument is based exclusively on these pleadings. We are not confronted with evidence that a consumer was actually aware of the existence of alternate providers and aware or should have been aware that the contracts used by those providers lacked the challenged contractual term.
[7] Notably, we believe the issue before us is properly framed as whether the existence of market choice negates the existence of oppression, not whether choice renders a contract nonadhesive. (Morris v. Redwood Empire Bancorp (2005) 128 Cal.App.4th 1305, 1319-1320 & fn. 6, 27 Cal.Rptr.3d 797; see also Marin Storage, supra, 89 Cal.App.4th at pp. 1054-1056, 107 Cal.Rptr.2d 645; Wayne v. Staples, Inc. (2006) 135 Cal.App.4th 466, 483, 37 Cal.Rptr.3d 544; but see Szetela, supra, 97 Cal.App.4th at p. 1100, 118 Cal. Rptr.2d 862.)
[8] Such unusual circumstances were arguably present in Dean Witter, where the court held only that the challenged provision was not procedurally unconscionable "as to the sophisticated investor-attorney specializing in class action litigation involving financial institutions, who sought and obtained appointment here as the class representative." (Dean Witter, supra, 211 Cal.App.3d at p. 772, 259 Cal.Rptr. 789.) Where the plaintiff is highly sophisticated and the challenged provision does not undermine important public policies, a court might be justified in denying an unconscionability claim for lack of procedural unconscionability even where the provision is within a contract of adhesion.
[9] The Supreme Court continued, "Thus, a contract of adhesion is fully enforceable according to its terms [citations] unless certain other factors are present which, under established legal rules  legislative or judicial  operate to render it otherwise." (Graham v. Scissor-Tail, Inc., supra, 28 Cal.3d at pp. 819-820, 171 Cal.Rptr. 604, 623 P.2d 165.) One of the bases to refuse enforcement described by the Supreme Court is an "unconscionability" analysis focusing entirely on the degree of substantive unfairness of the challenged provision, which is parallel to the "substantive unconscionability" analysis in A & M Produce, supra, 135 Cal.App.3d 473, 186 Cal.Rptr. 114. (Graham v. Scissor-Tail, at pp. 821-828, 171 Cal.Rptr. 604, 623 P.2d 165; California Grocers Assn. v. Bank of America (1994) 22 Cal. App.4th 205, 213-214, 27 Cal.Rptr.2d 396.) The adhesive nature of the contract alone justifies scrutiny of the substantive fairness of the contractual terms. (Graham v. Scissor-Tail, at pp. 824-825, 171 Cal.Rptr. 604, 623 P.2d 165.)
[10] Arguably, the CLRA's non-waiver provision, Civil Code section 1751, provides an independent basis for affirming denial of the motion to compel arbitration. (See America Online, Inc. v. Superior Court (2001) 90 Cal. App.4th 1, 108 Cal.Rptr.2d 699; Discover Bank, supra, 36 Cal.4th at pp. 158-159, 30 Cal.Rptr.3d 76, 113 P.3d 1100.) T-Mobile contends that the Federal Arbitration Act preempts any application of Civil Code section 1751 to deny enforcement of the arbitration provision, citing Ting v. AT&T (9th Cir. 2003) 319 F.3d 1126, 1147-1148. Because we conclude that the arbitration provision is unconscionable, we need not decide the Civil Code section 1751 issue nor the other challenges to the service agreement raised by plaintiffs.
[**] See footnote *, ante.
[1] The definition of "contract of adhesion" that appears in the quote from Little  "imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it"  is taken from Neal v. State Farm Ins. Co. (1961) 188 Cal.App.2d 690, 694, 10 Cal.Rptr. 781 (Neal). Graham v. Scissor-Tail, Inc. (1981) 28 Cal.3d 807, 817, 171 Cal.Rptr. 604, 623 P.2d 165 (Scissor-Tail), characterized it as the "serviceable general definition [that has] well stood the test of time and will bear little improvement."
[2] In a single paragraph the trial court concluded the service agreement has "some indications" of procedural unconscionability, but "these [unidentified] indications are not particularly strong." But the court's actual references reflect the absence of procedural unconscionability. The court noted that adhesive contracts are generally enforced, that the arbitration provision is in paragraph 3 of the agreement and in capital letters (implying it was not hidden from the purchaser), that the contract comes with the phone and is accepted by use of the phone, and that use of a form contract and acceptance by using the product are not per se unconscionable. It denied the motion to compel after concluding that it was substantively unconscionable under the Discover Bank analysis.
[3] Villa Milano Homeowners Assn. v. II Davorge (2000) 84 Cal.App.4th 819, 827, 102 Cal.Rptr.2d 1, took a different view of Madden, stating: "[T]he court [in Madden] left open the possibility that, in a given case, a contract might be adhesive even if the weaker party could reject the terms and go elsewhere. [Citation.]"
[4] In Aral v. EarthLink, Inc. (2005) 134 Cal. App.4th 544, 36 Cal.Rptr.3d 229 (Aral) the terms of the services agreement for a digital subscriber line (DSL), including a class action waiver, were presented in what Aral characterized as a "`take it or leave it'" basis, either through the customer's installation of the software necessary to activate the DSL or through the materials included in the package in which the software was mailed to the customer "with no opportunity to opt out." (Id. at p. 557, 36 Cal.Rptr.3d 229.) Aral concluded "[t]his is quintessential procedural unconscionability." (Id. at p. 557, 36 Cal.Rptr.3d 229.) Aral does not assist in the resolution of the case before us because the issue of whether meaningful choices of DSL service were available to the customers was nowhere raised in Aral.
[5] See majority, page 353, footnote 6. The referenced "third consolidated amended" complaints against Nextel and Sprint in the coordinated proceeding and the attached service agreements are in the record on appeal. Because plaintiffs failed to respond to T-Mobile's contention asserted in the trial court and on appeal that alternative sources were available, I would view the point as conceded. (Fisher v. Gibson (2001) 90 Cal.App.4th 275, 283-284, 109 Cal.Rptr.2d 145.) Rather, plaintiffs' opposition to T-Mobile's motion to compel in the trial court and its arguments on appeal presumed that plaintiffs' allegations of a "contract of adhesion" describe "maximum procedural unconscionability" under California law. I believe California law provides otherwise.